60 CCPA

**AMERICAN EXPRESS COMPANY,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5485.**

United States Court of Customs
and Patent Appeals.

Feb. 8, 1973.

Edward Garfield, Frederic S. Nathan, Greenbaum, Wolff & Ernst, Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant. Leo Rosen, E. Thomas Honey, New York City, of counsel.

E. Grey Lewis, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Frederick L. Ikenson, John A. Gussow, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

ALMOND, Judge.

This appeal is from a decision and judgment of the United States Customs Court, 67 Cust.Ct. 141, 332 F.Supp. 191, C.D. 4266 (1971), overruling the importer's protest against the assessment of countervailing duties on certain galvanized fabricated structural steel units for the erection of electrical transmission

towers (hereinafter "tower units")[1] which were imported from Italy. The duty, at 13.67 lire per kilogram, was assessed by the regional commissioner in compliance with an order of the Secretary of the Treasury, T.D. 67–102 (1 Cust.Bull. 212). The order resulted from the determination of the Secretary, under the provisions of section 303 of the Tariff Act of 1930, 19 U.S.C. § 1303, that Italy bestows an indirect bounty on such tower units. Appellant challenges the validity of that order.

In pertinent part. T.D. 67–102, issued April 17, 1967 after an investigation by the Secretary,[2] reads:

> Information was received in proper form pursuant to the provisions of section 16.24(b) of the Customs Regulations (19 CFR 16.24(b)) alleging that certain rebates or refunds granted by the Government of Italy on the exportation from Italy of galvanized fabricated structural steel units for the erection of electrical transmission towers constitute the payment or bestowal of a bounty or grant, directly or indirectly within the meaning of section 303 of the Tariff Act of 1930 19 U.S.C. 1303), upon the manufacture, production, or exportation of the units to which the refunds apply.

> An investigation was conducted pursuant to section 16.24(d) of the Customs Regulations (19 CFR 16.24(d)).

> After consideration of all information received, the Bureau is satisfied that exports of such steel units for electrical transmission towers from Italy receive bounties or grants within the meaning of section 303.

> Accordingly, notice is hereby given that galvanized fabricated structural

steel units for the erection of electrical transmission towers imported directly or indirectly from Italy (except any such importations which are free of duty under the Tariff Act of 1930, as amended), if entered for consumption or withdrawn from warehouse for consumption after the expiration of 30 days after publication of this notice in the Customs Bulletin, will be subject to the payment of countervailing duties equal to the net amount of any bounty or grant determined or estimated to have been paid or bestowed.

> In accordance with section 303, the net amount of such bounty or grant under the information presently available has been ascertained and determined, or estimated, and such net amount is hereby declared to be 13.67 lire per kilo of the product.

Section 303 of the Tariff Act of 1930, upon which T.D. 67–102 was grounded, provides:

> Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or

---

1. The tower units included steel angles and gusset plates which were classified under TSUS items 609.84 and 657.20, respectively. Assessment of regular duties under these provisions was not challenged.

2. The record reveals that the investigation was commenced by the Treasury Department after it received written complaints in June of 1966; the Italian Government

supplied information on its tax and rebate laws and voiced its objections to the imposition of countervailing duty to Treasury officials; and Societa Anonima Elettrificazione (SAE), the manufacturer of the merchandise in controversy, was aware of the investigation and, on December 3, 1966, began to make its views known to the Treasury through correspondence, conferences and telephone conversations.

merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

Appellant's protest, with an item (No. 7) omitted because it was not pressed by appellant, reads:

(1) No bounty or grant was paid or bestowed by the Republic of Italy directly or indirectly upon the manufacture, or production or exportation of the said imported merchandise;

(2) The refund by the Republic of Italy, pursuant to Italian Law No. 639, of the Italian internal taxes, duties and charges which are the subject of Treasury Decision No. 67–102 does not constitute a bounty or grant within the meaning of Section 303 of the Tariff Act of 1930 and the amendments thereto (19 U.S.C. § 1303), and said Treasury Decision is outside the authority of the Secretary of the Treasury;

(3) The question of whether the refund of said Italian internal taxes is a bounty, grant or subsidy and of whether countervailing duty can be imposed is governed by Article VI (4) of the General Agreement on Tariffs and Trade which is not, and was not intended by the United States to be, inconsistent with Section 303 of the Tariff Act of 1930 as amended, and

Treasury Decision No. 67–102 contravenes said Article VI (4);

(4) Prior to the issuance of Treasury Decision No. 67–102, the Secretary of the Treasury had knowledge that countries other than Italy make refunds of internal taxes, duties and charges of like character on like products and other products exported to the United States but he failed to order the imposition of countervailing duty against importations of such products to the United States, thereby discriminating against Italy and failing to accord most-favored nation treatment in contravention of Article I(1) of the General Agreement on Tariffs and Trade and Article XIV(1) of the Treaty of Friendship, Commerce and Navigation between the United States and Italy, and also thereby depriving importers of said merchandise from Italy of due process of law and the equal protection of the laws in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States;

(5) There has been a uniform and consistent administrative practice and interpretation of Section 303 of the Tariff Act of 1930 as amended, and its predecessors, to the effect that refunds of internal taxes by an exporting country do not constitute bounties or grants subject to countervailing duty, which administrative practice and interpretation was approved and adopted by Congress prior to the issuance of Treasury Decision No. 67–102;

(6) To the extent that Treasury Decision No. 67–102 is based on a supposed delegation of power to the Secretary of [sic] Treasury to differentiate the particular Italian internal taxes covered by Treasury Decision No. 67–102, from other types of internal taxes, such delegation of Congressional authority would contravene the Constitution of the United States as there are no standards contained in Section 303 of the Tariff Act of 1930

as amended governing the action of the Secretary of the Treasury;

\* \* \* \* \* \*

(8) The Secretary of the Treasury failed to comply with the requirements of the Administrative Procedure Act (5 U.S.C. § 1001 et seq.) and deprived the importer of due process of law in contravention of the Fifth Amendment to the Constitution of the United States.

The evidence in the case consists of two stipulations of facts and accompanying documentary exhibits, testimony of five witnesses for appellant and two witnesses for appellee, and additional documentary exhibits. Objections to certain of the exhibits were, by agreement, reserved for determination of the Customs Court in its opinion and, in some cases, these objections were sustained by the court.

The basis for the action of the Secretary in T.D. 67–102 was the remission by the Republic of Italy, under Italian Law No. 639, of certain internal charges or taxes on the tower units upon their exportation. The charges remitted were termed "Basic Rate Taxes" and included overhead items such as customs duties on factory machinery, registration taxes, stamp taxes, transportation documents taxes, insurance taxes, mortgage taxes and surtaxes. The Italian Government computed the total Basic Rate Taxes that were levied on the tower units to have amounted to 15.08 lire per kilogram and the total amount of such taxes remitted upon exportation to have been 13.67 lire per kilogram, which is the amount of bounty "ascertained and determined, or estimated," by the Secretary.

### The Customs Court

The Customs Court first considered objection No. 8 of the protest, supra, which charged that T.D. 67–102 was

void for failure of the Secretary to comply with the requirements of the Administrative Procedure Act (hereinafter APA), 5 U.S.C. § 1001 et seq. (now 5 U.S.C. § 551 et seq.), and deprived the importer of due process of law in contravention of the Fifth Amendment. The court held that objection was too broad and general to reveal the nature of the violations charged to the Secretary, and hence did not confer jurisdiction upon the regional commissioner or the court to review the Secretary's action. For that reason, it made no ruling on the merits of particular matters which were raised by appellant in objection No. 8.

The Customs Court ruled adversely to appellant on the merits of the issues raised under objections 1, 2, 3, 4, 5, and 6 of the protest,[3] supra. It held that the refund of the Basic Rate Taxes pursuant to Italian Law No. 639 constituted a bounty within the meaning of section 303. It ruled that Article VI(4) of the GATT, even if interpreted as appellant urged, would not require a different result since it is a trade agreement and must yield to a statutory provision such as section 303 in the event of conflict. The court also did not agree with appellant's charge that T.D. 67–102 discriminated against Italy and violated obligations to accord most-favored-nation treatment to its importations arising from the GATT and the Treaty of Friendship, Commerce and Navigation between the United States and Italy (hereinafter Italian Treaty), 63 Stat. 2255 (1949). Finally, it did not find an abridgment of appellant's rights under the Fifth Amendment to the United States Constitution.

### The Jurisdictional Holding

For reasons more fully set forth hereinafter, we hold that the matters which appellant has argued on the basis of

---

3. The points actually advanced by appellant in the Customs Court and here do not coincide fully with the language of the protest, and some points alluded to in the

protest are no longer argued. This opinion is directed to the issues actually argued before us.

objection No. 8 of its protest are clearly without merit. Therefore, the Customs Court's holding of lack of jurisdiction as to that objection need not be considered.

### The Procedural Question and the Administrative Procedure Act

Appellant's position regarding the APA, as now developed, is that T.D. 67–102 is invalid because its promulgation constituted a rule-making activity within the purview of the APA that was carried out "without compliance with the procedural requirements of * * * [that Act] and of the Customs Regulations." Specific reliance is placed upon the admission by the appellee that notice of the proposed action under section 303 which resulted in T.D. 67–102 was not published in the Federal Register as is required by the APA in the case of a proposed rule making.[4]

Pertinent to this issue are the following definitions set out in the APA, 5 U.S.C. § 551(4), (5), (6) and (7):

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order.

These definitions per se do not clearly establish whether the Secretary's activities in connection with a countervailing duty determination under section 303 would constitute rule making or an adjudication pursuant to an order if the APA is assumed to be applicable to section 303 investigations. However, resort to other sources, including Administrative Procedure Act, Legislative History, 79th Congress 1944–46 (hereinafter *History*) and Attorney General's Manual on the Administrative Procedure Act, 1947 (hereinafter *Manual*) helps resolve the question. Thus, it is indicated that rule making is legislative in nature (*History*, pp. 193, 251, 353; *Manual*, pg. 14), is primarily concerned with policy considerations for the future rather than the evaluation of past conduct (*History*, pg. 355; *Manual*, pg. 14), and looks not to the evidentiary facts but to policy-making conclusions to be drawn from the facts (*Manual*, pg. 14). On the other hand, adjudication is judicial rather than legislative in nature (*History*, pp. 193, 251, 353, 355), has an accusatory flavor and may result in some form of disciplinary action (*History*, pp. 353, 408; *Manual*, pg. 14), and is concerned with issues of fact under stated law (*History*, pg. 353; *Manual*, pp. 14–15).

Other authority is to similar effect. Thus, "adjudication resembles what courts do in deciding cases, and * * * rule making resembles what legislatures do in enacting statutes." 1 Davis, Administrative Law Treatise, pp. 287–8. See also Willapoint Oysters v. Ewing, 174 F.2d 676, 693 (9th Cir. 1949), cert. den., 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949).

Applying these principles, it is our view that the Secretary's determination of the existence and amount of a bounty pursuant to his authority under

---

4. That requirement, subject to exceptions not requiring consideration here, is made by 5 U.S.C. § 553(b).

section 303 is not rule making under the APA even if that Act is otherwise applicable. The clear language of section 303 empowers the Secretary to determine that a bounty has been paid and to "ascertain and determine, or estimate, the net amount." When this is done, section 303 *commands* that a countervailing duty be levied equal to the amount of the bounty paid to the exporter. Therefore, once it has been determined that a bounty exists, the Secretary has no discretion but to levy the appropriate countervailing duty. See United States v. Hammond Lead Products, 440 F.2d 1024, 1031, 58 CCPA 129, 139, C.A.D. 1017 (1971), cert. den., 404 U.S. 1005, 92 S. Ct. 565, 30 L.Ed.2d 558 (1971).

We find that an investigation for the purpose of determining the existence of a bounty is in the nature of a fact-finding activity rather than rule making. That levying a countervailing duty is not discretionary with the Secretary indicates he does not act to carry out any delegated legislative authority.[5] See T. M. Duche & Sons v. United States, 39 CCPA 186, 190, C.A.D. 485 (1952), cert. den., 344 U.S. 830, 73 S.Ct. 35, 97 L.Ed. 646 (1952) and cases cited therein.

Appellant considers the Anti-Dumping Act and the countervailing duty statute to be substantially *in pari materia* and asserts that the law is settled in the Customs Court that an anti-dumping determination is governed by the APA and is rule making within the meaning of that Act, citing the Third Division's decision in Elof Hansson v. United States, 43 Cust.Ct. 627, A.R.D. 114 (1959), rev'd on other grounds, 48 CCPA 91, C. A.D. 771 (1960), cert. den., 368 U.S. 8 99, 82 S.Ct. 179, 7 L.Ed.2d 95 (1961).

But whatever the status of the holdings in *Hansson* regarding the application of the APA to proceedings under the Anti-Dumping Act in the Customs Court,[6] this court did not adopt them in reviewing that case or in any other case, and we do not do so now. Our own consideration of the Third Division's reasoning in *Hansson* does not satisfy us that the Secretary's action in section 303 determinations is rule making, and we reject any holding therein that might be in conflict with our view that rule making under the APA is not involved here.

■ At the time of the Secretary's investigation,[7] the Customs Regulations made pursuant to section 303 provided broadly for "such investigation * * * as appears to be warranted by the circumstances of the case" and for consideration of "any representations offered by foreign interests, importers, domestic producers, or other interested persons." 19 CFR 16.24. They made no specific requirement for notice and obviously were not violated by the Secretary's procedure in conducting the investigation. Subsequently, on September 11, 1967, 19 CFR 16.24 was amended to provide for publication of notice of countervailing duty investigations. Appellant points to that change as apparently having some unspecified significance here. However, we do not consider the change in itself to be any indication that publication of notice was required by section 303, the APA, or the previous regulations.

### The Secretary's Finding

The rationale on which the Secretary determined that the remission of the Basic Rate Taxes on the tower units here constituted a bounty or grant under sec-

---

5. It is of interest that Mr. E. Bruce Butler, in an article upon which appellant relies, Butler, Countervailing Duties and Export Stabilization: A Re-emerging Issue in International Trade, 9 Virginia Journal of International Law 82 (1969), characterized the countervailing duty determination as an adjudication rather than a rule-making activity, stating that the determination of the existence of a bounty has characteristics of both an order and a

rule but that the decision resembles an order (id. at 130–131).

6. See Imbert Imports, Inc. v. United States, 65 Cust.Ct. 697, R.D. 11718 (1970), aff'd, 67 Cust.Ct. 569, A.R.D. 294 (1971), now on appeal to this court (Customs Appeal No. 5483), and The Hoenig Plywood Corp. v. United States, 51 Cust.Ct. 336, R.D. 10569 (1963).

7. See note 2.

tion 303 is spelled out in the following item of the first stipulation between the parties:

> (e) In reaching his decision in T.D. 67–102, the Secretary of the Treasury adopted an interpretation of "bounty or grant" in Section 303, as it applies to taxes or other charges rebated upon exportation of merchandise dutiable under United States law, as including the following: the remission, rebate, refund, or abatement, however accomplished, of taxes or other charges which are not directly related to the exported product or to the raw materials or components used therein.

The Customs Court sustained the Secretary's finding on the authority of Downs v. United States, 4 Cir., 113 F. 144, aff'd at 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903). That case involved section 3 of the Tariff Act of 1897, which is the precursor of present section 303, there being no change in language that is material here.[8] The court regarded that case as demonstrating that "the Supreme Court regarded tax remission associated with the exportation of merchandise to constitute an indirect bounty within the meaning of the term 'bounty' as used in * * * [the statute]." It deemed the present remissions to be bounties under that criterion, apparently without regard to whether they amounted to less than the taxes originally extracted. The court also considered the broad concept of an indirect bounty set forth in Downs to have been reaffirmed by the Supreme Court in Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L. Ed. 461 (1919).

Appellant asserts that the broad holdings of Downs and Nicholas relied upon by the Customs Court in this case are dicta, and are well recognized as such.

It points out that in both of those cases the remission on the exported merchandise was in excess of, or included something in addition to, the internal tax previously assessed, and countervailing duty was imposed only on the value of the excess or addition. It is also urged by appellant that the Treasury Department has continuously followed the practice of not treating internal tax remissions as bounties where the remissions were not excessive (did not exceed the tax originally imposed). As to the present case, appellant points to the calculations which were stipulated to have been made by the Italian Government as indicating that the amount of Basic Rate Taxes remitted was less than the amount of such taxes imposed. For that reason, it regards the Secretary's action here to be in violation of the aforesaid practice.

■ We find that the Secretary's order must be sustained on the basis on which he relied—the absence of a direct relationship between the taxes or charges remitted and the exported tower units or components or raw materials employed. Therefore, whether the broader concept of a bounty on which the Customs Court relied is valid, or supported by the Downs and Nicholas cases, need not be determined.

Appellant's contention that there has been an administrative practice of exempting non-excessive tax rebates from the countervailing duty provisions is based solely on cases where the rebates were of excise taxes imposed on, and directly related to, the exported product.[9] No practice has been established as to rebates of hidden taxes of the type involved here which are not directly related to exported merchandise. In fact, rebates of such taxes appear to be of re-

8. Extension of the statute to cover "the manufacture or production or export" of commodities, instead of only their "exportation," was made in the Tariff Act of 1922. The Tariff Act of 1930 incorporated the changes permitting the Secretary to *estimate* the amount of the bounty.

9. Taxes levied on the sale of products and only indirectly related to income and profits, like excise, sales and turnover taxes, are denominated generally "indirect" taxes. Taxes levied on profits, as income and corporate profits taxes, constitute so-called "direct" taxes.

cent origin and the present case is one of first impression in the courts.

*Ordinary excise taxes are collected at* a production stage of the product or on the basis of wholesale or retail sales of the product. They are imposed on the product and thus are directly related to it or to its components. The presumption has generally been that such an excise tax is passed on completely, or fully shifted forward, to the ultimate consumer in the home market. From that presumption, it has been concluded that a non-excessive rebate of an excise tax would not encourage exportation since the profit on domestic and foreign sales would be the same.

On the other hand, the Italian Basic Rate Taxes are hidden taxes, in international parlance "taxe occulte." Stamp taxes required upon the purchase of the plant and equipment and taxes on mortgages on real property, examples of the hidden taxes involved here, are not directly related to the steel tower units. The effect of the rebate based on them on home market and export charges for the units cannot be ascertained in the same comparatively straightforward manner as rebates of ordinary excise taxes. While Congress has decreed that the Secretary impose countervailing duty when a bounty has been paid, it has left to the Secretary the determination of whether a bounty was in fact paid. Through the exercise of his expertise in financial and economic fields, the Secretary has found that there is no direct relationship between the rebated Italian Basic Rate Taxes here and the exported tower units. The nature of these taxes, as evidenced by stipulation of the parties, supports that conclusion, and we find no error of law in the holding that rebates based on such taxes not directly related to the product constitute a bounty within the provisions of section 303.

Appellant urges that the Basic Rate Taxes were shifted forward to the Italian consumer and points to two portions of the stipulation between the parties as establishing that as a fact. The first portion is a paragraph reading:

The Basic Rate Taxes defined * * * above are among the customs duties, excise taxes and border taxes which were and are, in whole, or in part, rebated to the fabricators of tower units in Italy pursuant to Law No. 639 * * * by the Government of the Republic of Italy upon the exportation of tower units to the United States. The Government of the Republic of Italy represented to the Secretary of the Treasury or his designates, during the course of investigation leading to the imposition of the subject countervailing duties, that, in computing the total amount of such Basic Rate Taxes to be rebated to fabricators of tower units in Italy, it had computed, from tax collection and other data available to it, the average amounts of the various categories of such Basic Rate Taxes previously imposed or levied upon fabricators of tower units and included in the prices received from the fabricators' customers on the Italian market.

The second is a statement that "neither of the parties herein questions the correctness of the aforesaid representations." Appellant particularly relies on the reference in the quoted paragraph to the "average amounts" that the Italian Government "had computed" as "included in the prices received from the fabricators' customers on the Italian market."

The most we can make out of the stipulation is that the "average amounts" of the Basic Rate Taxes "computed" were not disputed. The last clause emphasized by appellant does not specify what the effect of the taxes was on the relationship between domestic and export prices of the manufacturer. In a broad or general sense, all taxes paid by a producer are ultimately "included" in the prices paid by its customers even if the producer has had to be content with a smaller profit than it otherwise would have received. If appellant intended the stipulation to have the particular mean-

ing that there was a full forward shift of the burden of the Basic Rate Taxes to the Italian consumer, it could easily have proposed appropriate language to make that meaning clear to all concerned.

The Secretary's determination that the present rebate of taxes amounted to a bounty finds most significant support in the position taken by the European Economic Community (EEC) concerning remissions made by the Italian Government under the same Italian Law No. 639 involved here. Article 96 of the Treaty of Rome [10] provides that products exported to a member state may "not benefit from any drawback of internal charges in excess of those charges imposed * * * on them." In 1963, the EEC Commission declared that Italy violated Article 96 by relating, on exported products in the machine parts industry, charges related to such overhead items as advertising, plant, energy and transportation. In 1965, the EEC Court of Justice upheld the Commission.[11] As to that case, a writer analyzing recent countervailing duty developments [12] reported:

> The Court held that the refunds or "drawbacks" made under Law No. 639, which involved registration, stamp and hypothecary duties, and taxes on licenses and concessions, motor vehicles and advertising, were unauthorized under article 96 because, in the words of the opinion, "they are imposed neither on the products as such nor upon the raw materials or semifinished products used in their manufacture and because it was thus impossible to separate their respective

effect on the cost price of the products * * *." [Footnote omitted.]

Concerning the same EEC Court determination, another writer commented: [13]

> The Court reasoned that the various levies mentioned were imposed neither on the products exported as such, nor upon the raw materials or semi-finished products used in their manufacture, but rather upon the whole production undertaking. The test suggested by the European Court appears to be whether the rebate is for taxes imposed upon the product at any stage of its manufacture, or upon commercial and financial activities of the enterprise as a whole. Rebates for taxes imposed on the activities as a whole are prohibited because of the difficulty in measuring the effect of these taxes upon the price of the products.

Appellant does not dispute the holding of the Customs Court that Article VI (4) of the GATT cannot prevail over section 303 on the issue of whether the rebate of the Basic Rate Taxes warrants imposition of countervailing duties.[14] On the other hand, appellee finds an indication of support for the Secretary's view that such rebate is a bounty under the GATT, stating:

> In a Working Party Report adopted by the contracting parties to GATT, practices which were considered to be deemed subsidies were "the exemption in respect of exported goods, or [sic: of] charges or taxes, other than charges in connection with the importation or indirect taxes *levied at one or several stages on the same goods* if

10. Treaty Establishing the European Economic Community, March 25, 1957, 298 U.N.T.S. 53.

11. Re Drawback on Italian Machine Parts: EEC Commission v. Italy, reported at 5 Com.Mkt.L.R. 97 (1966).

12. Feller, Mutiny Against the Bounty: An Examination of Subsidies, Border Tax Adjustments and the Resurgence of the Countervailing Duty Law, 1 Law and Policy in International Business 17 (1969) at 58.

13. Butler, supra, note 5, at 117–18.

14. That holding finds support not only in the reasoning of the Customs Court that a law of Congress prevails over a trade agreement but also in the fact that the United States undertook Part II of the GATT, which includes Article VI(4), " * * * to the fullest extent not inconsistent with existing legislation." Protocol of Provisional Application of the GATT, 61 Stat. A 2051 (1947).

sold for internal consumption [taxes directly related to the product]," and "[t]he remission, *calculated in relation to exports, of direct taxes* or social welfare charges on industriaal or commercial enterprises \* \* \*" GATT, Basic Instruments and Selected Documents [BISD] 9th Supp., at 186–187 (1961).

We think that this description of subsidies does show further international recognition of the validity of a "direct relationship to the product" test for taxes that can properly be remitted on exported products.

### Most-Favored-Nation Treatment

Appellant charges that requirements for most-favored-nation treatment in Article XIV(1) of the Treaty of Friendship, Commerce and Navigation between the United States and Italy, 63 Stat. 2255, was violated by the imposition of countervailing duty on tower units under T.D. 67–102. It refers to allegedly "extensive and overwhelming documentary proof" it submitted as showing that other countries were refunding "like taxes for like products" with the knowledge of the Secretary without his having countervailed on those products. The Customs Court, holding certain of appellant's evidence inadmissible, concluded that there was no competent, factual evidence that the Treasury Department had contemporaneous knowledge that tax remissions like those made here were made on merchandise from other countries classifiable

in the same categories as the present tower units.

We find, in conformity with arguments of appellee, that discrimination in violation of the most-favored-nation requirement of the Italian Treaty has not been proved even if all of the documents submitted by appellant are considered.[15] Article XIV(1) of the Treaty provides that each contracting party "shall accord to articles the \* \* \* manufacture of the other \* \* \*, treatment no less favorable than the treatment \* \* \* accorded to like articles the \* \* \* manufacture of \* \* \* any third country."[16] Substantiation of appellant's charge would at least require that it show importation into the United States, without countervailing duty action, of articles from third countries that were like the Italian tower units and were subjected to the same tax remission practice as were the tower units. Appellant has not done that.

We do accept, as did the Customs Court, certain census reports offered by appellant as indicating that merchandise classifiable in the same TSUS categories as the tower units was imported from other common market countries. However, those categories[17] include a broad provision for angles, shapes and sections of steel and a basket provision for articles of steel not specially provided for. The imports from the other countries thus have not been shown to include any articles that would fall within the limited class of "galvanized fabricated structural steel units for the erection of elec-

---

15. Among the exhibits offered by appellant and rejected by the Customs Court which we have considered are a memorandum by appellant's attorney regarding proceedings at a conference between Italian officials and Treasury Department officials during the investigation that resulted in T.D. 67–102, a copy of a speech by Assistant Secretary of the Treasury Surrey before the National Industrial Conference Board in New York City on February 15, 1968, and a portion of a report of the Organization for Economic Cooperation and Development dated October 12, 1964.

16. Before us, appellant also refers to Article XIV(2) which accords nationals,

etc. of each country equal treatment to that accorded nationals of third countries; Article XV(2), which restricts advances in rates of duty as to goods en route between nationals, etc. of the two countries at the time the advance is made; and Article XVI(3), which relates to equal treatment between the two treaty countries. Not only does the record fail to show that these provisions were relied on below but also appellant has not pointed out any valid reason why they are pertinent to the issue.

17. TSUS, items 609.84 and 657.20.

trical transmission towers," the sole product on which T.D. 67–102 directs that a countervailing duty shall be levied. A failure to impose countervailing duty on products from third countries that are not established as being of such character as to be competitive with Italian tower units plainly is not indicative of discrimination which can invalidate an otherwise legitimate treatment of those units under section 303.

Aside from the question of like products, the evidence that appellant relies on to establish that third countries indulged in remission practices that should have been countervailed against is also insufficient. That evidence comprises papers of Treasury and OECD officials, reports of the OECD, and an attorney's memorandum regarding a conference at which officials of the Italian Government argued with Treasury Department officials against the imposition of countervailing duties subsequently ordered in T.D. 67–102. Without regard to any question of the competency of such items to prove foreign laws, their content is too general to establish that the tax and rebate laws of any other country are such that a countervailing duty would be applicable to importations therefrom under the standards followed by the Secretary in the present case.

So far as appellant may continue to rely on the most favored nations treatment provision of the GATT, Article I(1), with regard to its charge of discrimination, that position obviously fails also because of the deficiencies in the evidence pointed out above.

We have not overlooked contentions of appellee that a self-executing treaty provision, like Article XIV of the Italian Treaty, does not invest enforceable rights in nationals of the United States and that countervailing duties are exempt from most-favored-nation provisions. However, in light of our conclusion that no discrimination has been proved, it is not necessary to consider those contentions.

### Constitutional Questions

■ Appellant advances arguments based on two aspects of the Constitution of the United States. First, it refers to Article I, Sections 9 and 10, which use the terms "laid on" and "lay on" with respect to certain prohibitions of taxes and duties involving the states. Appellant would equate those terms to "directly related to" as used in connection with the Secretary's view that the hidden taxes here are "not directly related to" the exported product and then rely on certain decided cases to show that taxes it regards as similar to Italy's Basic Rate Taxes have been found to violate those constitutional prohibitions. Appellant has not established any reason for interpreting "directly related to" as legally equivalent to "lay on" or "laid on" in the context of Article I, however, and the argument therefore is without merit.

■ The other Constitutional argument is that T.D. 67–102 is in violation of appellant's rights under the Fifth Amendment. The rationale of that argument seems to have narrowed down to the position that the Secretary's action was violative of a concept of equal protection which appellant considers applicable in tax cases. The cases cited for that proposition plainly fail to establish that any such concept applies to the Secretary's determinations under section 303, and we therefore find no violation of the Fifth Amendment. But even if the proposition were applicable, the absence of proof of discrimination discussed in our consideration of most-favored-nation treatment would deprive it of support in the present case.

The judgment is *affirmed*.

Affirmed.