ASG INDUSTRIES, INC., PPG Industries, Inc., Libbey–Owens–Ford Company, and C E Glass, Plaintiffs,

v.

UNITED STATES, Defendant.

C.D. 4863;  Court No. 76–3–00668.

United States Customs Court.

July 17, 1980.

Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., for plaintiffs.

Alice Daniel, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Branch Director, Joseph I. Liebman, New York City, Atty. in Charge, Field Office for Customs Litigation, John J. Mahon and Sidney N. Weiss, New York City, on briefs), for defendant.

*On Plaintiffs' Motion and Defendant's Cross–Motion for Summary Judgment*

FORD, Judge:

This action, instituted by domestic manufacturers and wholesalers of float glass, presents the issue of whether countervailing duties should be assessed on importations of float glass produced in Belgium. The Secretary of the Treasury (Secretary) has determined that no bounty or grant was paid or bestowed, within the meaning of section 303(a) of the Tariff Act of 1930, as amended by section 331(a) of the Trade Act of 1974, 88 Stat. 1978, 2049.

The parties have filed cross–motions for summary judgment, pursuant to rules 4.12 and 8.2 of the rules of this court.

Plaintiffs contend that various regional development programs administered by the Belgium Government, which include low–interest loans, investment subsidies in the form of cash grants, special accelerated depreciation rates at twice the normal rate, and exemptions from real estate taxes for a maximum period of five years, constitute bounties or grants being paid or bestowed upon the manufacture or production of float glass in Belgium.

Defendant's position is that the alleged bounties or grants do not possess the requisite effect upon international trade which would require imposition of countervailing duties.

The essential facts relating to the assistance given the two float glass manufacturers in Belgium are not in dispute, nor is the chronology leading to the final determination of the Secretary in finding that such assistance did not amount to a bounty or grant within the meaning of section 303(a), as amended, *supra*.

The statement of material facts, filed by the parties, establish that Boussois–Souchan–Neuvesel (BSN) and Glaceries de Saint–Roch (GSR) are the two manufacturers of float glass in Belgium. On June 3, 1974, plaintiffs filed a written petition with the Commissioner of Customs alleging bounties or grants were being paid or bestowed, directly or indirectly, upon the manufacture or production of float glass for export to the United States. A "Notice of Receipt of Countervailing Duty Petitions" was published in the Federal Register on January 15, 1975. As a result of the petition, an administrative investigation was conducted by the Department of Treasury, with the assistance of the United States Customs Service, pursuant to 19 U.S.C. § 1303 and 19 C.F.R. § 159.47(c) (1975), in order to make preliminary and final determinations.

On July 3, 1975 a "Notice of Preliminary Countervailing Duty Determination" was published in the Federal Register, 40 Fed. Reg. 28104, which states in part as follows:

On the basis of an investigation conducted pursuant to section 159.47(c) Customs Regulations (19 CFR 159.47(c)), it has been tentatively determined that benefits have been received under various regional development programs maintained by the Belgian Government. Assistance available in development areas includes interest rebates on loans or payment of equivalent amounts where investor capital is utilized, employment premi-

ums, reduced rate of capital gains tax, tax exemptions for interest rate subsidies and capital grants on investments, exemption from registration fees, levied on increases in assets, exemption from real estate taxes, advanced depreciation and exemption from local taxes.

Benefits derived from programs such as those which are the subject of this investigation can, in some circumstances, constitute bounties or grants within the meaning of the law. Since the information thus far made available concerning these programs has not been sufficient to permit a thorough analysis of their nature and effect, it has been determined preliminarily that imports of float glass from Belgium benefit from the payment or bestowal of a bounty or grant, directly or indirectly, within the meaning of the section 303 of the Tariff Act of 1930, as amended, by reason of the incentive programs mentioned above.

Before a final determination is made, consideration will be given to any relevant data, views or arguments submitted in writing with respect to this preliminary determination. Submissions should be addressed to the Commissioner of Customs, 1301 Constitution Avenue, N.W., Washington, D.C. 20229, in time to be received by his office on or before August 4, 1975.

On August 15, 1975 an "Amendment to Notices of Preliminary Countervailing Duty Determinations" was published in the Federal Register, 40 Fed.Reg. 34423, which extended to September 3, 1975, the time within which submissions with respect to the preliminary determination would be accepted.

A "Notice of Final Countervailing Duty Determination" was published in the Federal Register, 41 Fed.Reg. 1299, on January 7, 1976, which set forth the following reasons for the determination:

Information has now been received that permits a more complete analysis of the alleged bounties and grants. Under various regional development programs administered by the Government of Bel-

gium, low interest loans, investment subsidies in the form of cash grants, special accelerated depreciation rates and exemption from real estate taxes have been given to producers of float glass. The Belgian Government has advised the Treasury Department that these benefits have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions. Inasmuch as the recipient glass producers sell a preponderance of their production in the European Community (not less than 85 percent), the level of exports to the United States is a small percentage of the amount exported, and the amount of assistance provided by the regional incentive programs is less than 2 percent of the value of float glass produced, these benefits are not regarded as bounties or grants within the meaning of section 303 of the Act. All other benefits alleged in the petition are found either not to be bounties or grants or not to be applicable to the producers of float glass in Belgium.

Accordingly, for the reasons stated above, it is hereby terminated that no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303 of the Act, upon the manufacture, production, or exportation of float glass from Belgium.

On January 28, 1976 plaintiffs served a notice upon the Secretary, pursuant to 19 U.S.C. § 1516(d), advising of plaintiffs' desire to contest the negative determination before the Customs Court and requesting that publication of the notice be made forthwith as required by 19 U.S.C. § 1516(d).

On March 10, 1976 a notice entitled "Assessment of Countervailing Duties on Float Glass from Belgium" was issued by the Acting Commissioner of Customs, approved by the Assistant Secretary of Treasury, published in the Federal Register, 41 Fed. Reg. 10235, and contained the announcement that notification had been received from the plaintiffs that they desire to contest the negative countervailing duty determination.

On March 15, 1976 the summons in this action was filed with the Customs Court on behalf of plaintiffs.

The pertinent statutory provisions are as follows:

Section 303(a) of the Tariff Act of 1930, as amended by section 331(a) of the Trade Act of 1974, 88 Stat. 2049 (19 U.S.C. § 1303):

*Countervailing duties*

(a) *Levy of countervailing duties*

(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

\* \* \* \* \* \*

(3) In the case of any imported article or merchandise as to which the Secretary of the Treasury (hereafter in this section referred to as the "Secretary") has not determined whether or not any bounty or grant is being paid or bestowed—

(A) upon the filing of a petition by any person setting forth his belief that a county or grant is being paid or bestowed, and the reasons therefor, or

(B) whenever the Secretary concludes, from information presented to him or to any person to whom authority under this section has been delegat-

ed, that a formal investigation is warranted into the question of whether a bounty or grant is being paid or bestowed.

the Secretary shall initiate a formal investigation to determine whether or not any bounty or grant is being paid or bestowed and shall publish in the Federal Register notice of the initiation of such investigation.

(4) Within six months from the date on which a petition is filed under paragraph (3)(A) or on which notice is published of an investigation initiated under paragraph (3)(B), the Secretary shall make a preliminary determination, and within twelve months from such date shall make a final determination, as to whether or not any bounty or grant is being paid or bestowed.

(5) The Secretary shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated.

\* \* \* \* \* \*

Section 516(d) of the Tariff Act of 1930, as amended by section 321(f)(1) of the Trade Act of 1974, 88 Stat. 2048 (19 U.S.C. § 1516):

*Petitions by American manufacturers, producers, or wholesalers*

\* \* \* \* \* \*

(d) *Contest of Secretary's determination that foreign merchandise is not being sold in United States at less than fair value or that bounty or grant is not being paid*

Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

(2) under section 1303 of this title, that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

\*      \*      \*      \*      \*      \*

28 U.S.C. § 1582:
*Jurisdiction of the Customs Court*

\*      \*      \*      \*      \*      \*

(b) The Customs Court shall have exclusive jurisdiction of civil actions brought by American manufacturers, producers, or wholesalers pursuant to section 516 of the Tariff Act of 1930, as amended.

The facts relating to the programs established by the Belgium Government and the assistance covered by them are not in dispute. The information submitted to the court on these cross-motions for summary judgment is subject to some extent to a protective order entered by the court on June 9, 1977 and modified on July 13, 1977.

In July 1959 the Belgium Government established a regional aid program under which certain benefits were extended in order to encourage the establishment, extension, conversion and modernization of facilities. Originally, this aid applied to any portion of the country but was subsequently limited to areas specifically designated as less–developed regions.

The system of incentives for investment was organized by the Economic Expansion Act of December 30, 1970. The decisions rested with the Minister of Economic Affairs, while the criteria for obtaining benefits were set forth by:

1. The act itself;

2. Royal decrees or executory measures;

3. General guidelines with the Department of Economic Affairs.

The Economic Expansion Act defined certain conditions which a particular project must satisfy in order to receive benefits. The investment must take place in a designated development area; it must directly contribute to the expansion, conversion, or modernization of the business; and must conform to the "general economic interests." These interests were defined by Royal Decree, dated August 18, 1959, and included the following:

1. The creation of work in the framework of employment policy;

2. The creation of new industries and the manufacturing of new products;

3. The development of existing businesses which are adaptable to new market conditions;

4. The improvement of the situation in economically depressed areas;

5. The more rational use of Belgium's economic resources;

6. The improvement of working conditions, manufacturing conditions through increased profits and the quality of products; and

7. The development of research equipment.

Under the above programs, assistance was given by the Belgium Government, insofar as this case is concerned, in four categories:

Low–interest loans were made available in the form of interest rate rebates. Such rebates, up to a maximum of 5 percent for five years, could be applied to investment loans granted by approved financial institutions. Both BSN and GSR utilized this benefit.

Investment subsidies in the form of cash grants were provided pursuant to article 9 of the Economic Expansion Act of December 30, 1970. These cash grants were provided to the extent that a company made investments from its own funds. The grant replaced the interest rate rebate. In other

words, to the extent that a company made investments from its own funds, the interest rate rebate may be replaced by capital grants of equal value. A capital grant was provided only if the financial contribution made by the investing company from its own funds exceeded 50 percent of the cost of the program. BSN utilized the benefits of investment subsidies, while GSR did not avail itself of this benefit.

Pursuant to article 15, section 1 of the Economic Expansion Act of December 30, 1970, and article 12 of the Economic Expansion Act of July 14, 1966, firms were authorized to apply an annual rate of depreciation equal to twice the normal rate of depreciation over a period of three consecutive tax years for such investments which were made under this program. GSR availed itself of this benefit, while BSN did not.

Exemptions from real estate taxes were provided for under article 16 of the Economic Expansion Act of December 30, 1970. Under this provision firms which qualify for regional aid benefits may be exempt, for a maximum of five years, from paying real estate taxes. The exemption from real estate taxes was utilized by BSN, but not by GSR.

The record further establishes that at the time of the issuance of the "Notice of Final Countervailing Duty Determination" *supra*, with respect to float glass from Belgium, the Treasury Department had before it information which indicated the recipient glass producers sold a preponderance of their production in the European market (not less than 85 percent) and that the level of exports to the United States was a small percentage of the amount exported. The notice also stated that the amount of assistance provided by the regional incentive programs amounted to less than 2 percent of the value of the float glass in Belgium.

In a recent decision, *ASG Industries, Inc., et al. v. United States*, 610 F.2d 770, 67 CCPA ——, C.A.D. 1237 (1979), which involved float glass manufactured in West Germany, the court considered benefits such as low–interest loans, investment sub-

sidies in the form of cash grants, and tax credits granted under regional development programs. The court therein found the benefits to be bounties or grants and made the following observations:

Also, we hold that, for purposes of the countervailing duty law, the benefits (as analyzed above) bestowed by West Germany upon float glass manufacturers under the regional development programs were bounties or grants.[13]

[13] The Customs Court said "it would appear that bounties or grants were bestowed on the production of float glass in the Federal Republic of Germany."

At the same time, it must also be pointed out that appellants' proposed test (any benefit, that is not *de minimis*, bestowed by a foreign government in connection with the production of merchandise requires a countervailing duty) ignores the clear wording of the statute. Once it has been determined that a bounty or grant is being paid or bestowed, 19 U.S.C. 1303(a)(1) provides that "there shall be levied * * * a duty equal to the *net amount* of such bounty or grant." (Italic supplied.) Such language implies that certain deductions may be made from the actual payments to calculate the net bounty or grant and that all relevant circumstances are to be taken into account.[14]

[14] Congress reiterated this "net amount" concept in the legislative history of the extension of the waiver provision (note 9, *supra*):

The countervailing duty, which is imposed in addition to regular duties, is equal to the *net amount* of the bounty or grant and is intended to offset the *advantage* afforded by the foreign subsidy practice. (Italic added.)

S.Rep.No.96–45, 96th Cong., 1st Sess. 2, *reprinted in* [May 1979] U.S.Code Cong. & Ad. News No. 3, 488, 489.

With respect to the waiver provision, section 303(d), as amended by section 331(a) of the Trade Act of 1974, 88 Stat. 1978, 2049, the court in its decision stated as follows:

By section 331(a) of the Trade Act of 1974, Public Law No. 93–618, 88 Stat. 1978 (1975), Congress amended section 303 of the Tariff Act of 1930. Under new section 303(d) (19 U.S.C. 1303(d) (Supp. V 1975)),[9] which was added by this

[9] 19 U.S.C. 1303(d) (Supp. V 1975) reads as follows:

(d) *Temporary provision while negotiations are in progress.*

(1) It is the sense of the Congress that the President, to the extent practicable and consistent with United States interest, seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties.

(2) If, after seeking information and advice from such agencies as he may deem appropriate, the Secretary of the Treasury determines, at any time during the 4-year period beginning on January 3, 1975, that—

(A) adequate steps have been taken to reduce substantially or eliminate during such period the adverse effect of a bounty or grant which he has determined is being paid or bestowed with respect to any article or merchandise;

(B) there is a reasonable prospect that, under section 2112 of this title, successful trade agreements will be entered into with foreign countries or instrumentalities providing for the reduction or elimination of barriers to or other distortions of international trade; and

(C) the imposition of the additional duty under this section with respect to such article or merchandise would be likely to seriously jeopardize the satisfactory completion of such negotiations;

the imposition of the additional duty under this section with respect to such article or merchandise shall not be required during the remainder of such 4-year period. This paragraph shall not apply with respect to any case involving non-rubber footwear pending on January 3, 1975, until and unless agreements which temporize imports of non-rubber footwear become effective.

(3) The determination of the Secretary under paragraph (2) may be revoked by him, in his discretion, at any time, and any determination made under such paragraph shall be revoked whenever the basis supporting such determination no longer exists. The additional duty provided under this section shall apply with respect to any affected articles or merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of any revocation under this subsection in the Federal Register.

amendment, the Secretary could *waive imposition* [10] of a countervailing duty *if*:

[10] The Secretary's authority to waive imposition of countervailing duties was extended to July 26, 1979 (date of enactment of the Trade Agreements Act of 1979, Public Law No. 96–39), retroactive to January 3, 1979, when the previous waiver authority expired. Public Law No. 96–6, 93 Stat. 10 (1979).

(1) steps were taken to reduce substantially or eliminate the adverse effect of the bounty or grant; (2) there was reasonable prospect of trade agreements reducing or eliminating barriers to, or other distortions of, international trade; *and* (3) imposition of a countervailing duty would be likely to seriously jeopardize the negotiation of such agreements. 19 U.S.C. 1303(d)(2)(A)–(C).

During consideration of the bill (H.R. 10710) that became the Trade Act of 1974, it was made clear that all three conditions must be met before the Secretary could waive application of a countervailing duty, and it was emphasized that "either the bounty or grant or its adverse effect must be eliminated (or substantially reduced) before the Secretary would have authority to waive the imposition of a countervailing duty order during trade negotiations." It was explained that the amendments to the countervailing duty law "are designed to tighten the administration" of that law. S.Rep.No.93–1298, 93d Cong., 2d Sess. 185 and 187, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7320 and 7322. \* \* \*

Congress also made clear its understanding that "the present [countervailing duty] statute is mandatory in terms." H.R.Rep.No.93–571, 93d Cong., 1st Sess. 73 (1973). This demonstrates that, except for the waiver provision in the 1974 Act, the Secretary has not had any discretion to not impose a countervailing duty once it has been determined that a bounty or grant is being paid or bestowed. *American Express Co. v. United States*, 60 CCPA 86, 93, 472 F.2d 1050, 1056 (1973). \* \* \*

It is to be noted no question of waiver by the Secretary is involved herein. The benefits granted are, under the above decision, bounties or grants subject to countervailing duty. It is the function of the Secretary in cases involving bounties or grants to determine the net bounty. Since the Secretary in this case determined that no countervailing duty was attached, no such finding was made. The Court of Customs and Patent Appeals in C.A.D. 1237, *supra*, made the following comment:

Once it is established that a foreign manufacturer is receiving payments *such as those here involved* (*not* "every payment," as the dissenting opinion imagines) from its government, a countervailing duty *must*, absent a waiver by the Secretary, be imposed unless, in considering all circumstances surrounding the payment, certain deductions can be established resulting in no net benefit to that manufacturer. These deductions must be established by facts [16]—not by mere allegations of the foreign government or of the enterprises receiving the bounty or grant. Needless to say, without an adequate factual record, neither this court nor the Customs Court can perform a meaningful judicial review of countervailing duty determinations.

[16] If the Treasury Department cannot, with its expertise, establish the necessary facts, a countervailing duty must be imposed, although a challenge may be brought later by the importer. Because the importer is in a better position to obtain these facts from the foreign manufacturer, once a prima facie case has been established by evidence that payments *such as those here involved* are being made, the domestic manufacturer should not (contrary to the dissenting opinion) have the burden of obtaining evidence of deductions necessary to negate *its own prima facie case*. Also, we note that under 19 U.S.C. 1303(a)(5), the Secretary is permitted to *estimate* the net bounty (*i. e.*, estimate the necessary deductions), and his expertise will play a part in this estimate as long as there is a factual basis to support it.

In view of the foregoing, plaintiffs' motion for summary judgment is granted and defendant's cross–motion for summary judgment is denied.

It is further ordered that the Secretary of the Treasury (1) ascertain and determine or estimate the net amount of bounties or grants paid or bestowed upon the manufacture or production of float glass in Belgium by Boussois–Souchan–Neuvesel and Glaceries de Saint–Roch; and (2) direct the appropriate customs officers throughout the United States to assess countervailing duties in the net amount equal to said bounties or grants, entered or withdrawn from warehouse for consumption on or after the day following the date of entry of this order.