**ZENITH RADIO CORPORATION**

v.

**UNITED STATES.**

**C.D. 4691, Court No. 76–3–00637.**

United States Customs Court.

April 12, 1977.

Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), and Philip J. Curtis, Chicago, Ill., for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen. (David M. Cohen, Chief, Customs Section, Washington, D. C., and Velta A. Melnbrencis, New York City, trial atty.), for defendant.

Before RICHARDSON, NEWMAN and BOE, Judges.[1]

RICHARDSON, Judge:

Plaintiff, a domestic manufacturer of various consumer electronic products,[2] has instituted this action under 19 U.S.C.A., section 1303, for judicial review of the decision of the Secretary of the Treasury, and has moved for summary judgment pursuant to rules 4.12 and 8.2 of the rules of this court; and defendant has cross-moved for summary judgment. Plaintiff contends that the Government of Japan pays or bestows directly or indirectly a bounty or grant upon the exportation from that country of the aforesaid consumer electronic products in the form of the remission of, or exemption from, payment of a consumption tax to which these products would have been subjected had they not been exported. Defendant contends that the Japanese tax remission or exemption does not constitute a bounty or grant within the meaning of section 1303.

The essential facts of the controversy are not in dispute. The Japanese Commodity Tax Law, cited as Commodity Tax Law (March 31, 1962, Law No. 48) as revised, is a single-stage consumption tax which is levied usually at the manufacturing level on a fairly extensive list of consumer goods, inclusive of electronic products of the types manufactured by plaintiff. Rates of tax

1. The three-judge panel in this case was designated by the chief judge upon application of defendant pursuant to section 108 of the Customs Courts Act of 1970 (28 U.S.C.A. 255) and rule 4.13 of this court.

2. Television receivers, radio receivers, radio-phonograph combinations, radio-television-phonograph combinations, radio-tape recorder combinations, record players and phonographs complete with amplifiers and speakers, tape recorders, tape players, and color television picture tubes.

range generally from 5 to 40 percent. Upon exportation of these products from Japan, the tax is either remitted, if previously paid, or the products are exempted from the payment of the tax.[3]

Plaintiff petitioned the Secretary of the Treasury in 1970, alleging that the exemptions from or refund of the so-called "commodity tax" under the aforementioned Japanese Commodity Tax Law when the said electronic products were exported from Japan amounted to the payment or bestowal of bounties or grants directly or indirectly, upon the manufacture, or production in, or exportation from, Japan of said consumer electronic products. The petition asked the Secretary of the Treasury to impose countervailing duties on these imported products in accordance with section 1303. On January 7, 1976, a "Final Negative Countervailing Duty Determination" in the case of "Certain Consumer Electronic Products From Japan" was published in the Federal Register [41 Fed.Reg. 1298] at the instance of the Acting Commissioner of Customs upon the approval of the Acting Assistant Secretary of the Treasury. This determination stated that "a final determination is hereby made in this proceeding, that . . no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303, Tariff Act of 1930, as amended (19 U.S.C. 1303), upon the manufacturer [sic], production, or exportation of certain consumer electronic products from Japan."

Plaintiff after giving notice to the Secretary of the Treasury of its intention to contest this determination, which notice was duly published in the Federal Register [41 Fed.Reg. 10235], then instituted this action for a review of this determination in accordance with the provisions of 19 U.S.C.A., section 1516(d), as amended by the Trade Act of 1974. Section 1516(d), as amended, empowers this court to review, at the instance of American manufacturers, producers, or wholesalers, negative countervailing duty determinations made by the Secretary of the Treasury under 19 U.S.C.A., section 1303, relative to the existence of a bounty or grant on merchandise exported to the United States. The motions for summary judgment follow the joining of issue in said action. There is no question here but that the Japanese commodity tax in issue is either remitted when merchandise is exported from Japan if previously paid thereon, or the exported merchandise is not subject to the payment of tax. Plaintiff contends that the forgiveness of the commodity tax on exportation from Japan of the subject electronic products confers a direct or indirect benefit on the exportation of such products. Plaintiff argues:

> . . . The Supreme Court and the special customs tribunals have repeatedly held that the remission of taxes on exportation constitutes the conferral of a bounty or grant within the scope of our countervailing duty law. The legislative history of section 303 of the Tariff Act of 1930, as amended, provides ample support for that position. The forgiveness of the commodity tax on the exportation of the subject electronic products from Japan is clearly a bounty or grant under section 303, and the Secretary of the Treasury should be required to direct the assessment of countervailing duties to offset the bounty or grant so bestowed. [Brief in support of plaintiff's motion for summary judgment p. 5.]

Defendant contends that the Japanese commodity tax is not a bounty or grant within the meaning of section 1303. Defendant argues among other things:

> The historical and legislative background of the countervailing duty statute demonstrates that the countervailing duty provision was intended to cover only the excessive remission of taxes directly related to the imported product. For

---

**3.** Tax exempt status is also accorded to certain other categories of goods, not here pertinent, which are sold domestically to or for schools, other educational institutions and educational use, academic research organs and academic research use, social welfare institutions and persons engaged in social welfare activities, the National Museum, and other persons specified by government ordinance. (Defendant's cross-motion for summary judgment p. 2.)

over 75 years the Treasury Department construed the provision as applying only to such excessive remissions. Since at least 1951, Congress has been well informed of the Treasury's practice and has consistently failed to countermand it even though legislative amendments rendering all tax remissions subject to countervailing duty have been considered. Thus, Congress must be deemed to have approved the administrative interpretation. [Brief in opposition to plaintiff's motion for summary judgment and in support of defendant's cross-motion for summary judgment p. 4.]

Section 1303 reads in relevant part:

(a) Levy of Countervailing Duties.—(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

\* \* \* \* \* \*

The court agrees with the plaintiff in this case, and concludes that as a matter of law the Japanese commodity tax remission or exemption in issue here constitutes a bounty or grant within the meaning of section 1303. As such, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.

Section 1303 has its genesis in section 5 of the Tariff Act of 1897 which reads:

That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

In *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903), the Supreme Court of the United States held that tax remission is a form of indirect bounty within the meaning of section 5 of the 1897 Act. The *Downs* case involved an elaborate scheme of the Russian Government to control the production and price of sugar. Exporters of sugar were relieved of the ordinary excise tax which would have been payable had the sugar been sold domestically, and additionally, they received marketable certificates of value for their exports. These certificates could be sold to other sugar producers who would then be free to have their surplus sugar reclassified as free sugar and sold in the domestic market with-

out the prohibitive tax burden that would otherwise have accompanied the sale of surplus. The Supreme Court, addressing itself to this scheme stated (p. 515, 23 S.Ct. p. 228):

> The details of this elaborate procedure for the production, sale, taxation, and exportation of Russian sugar are of much less importance than the two facts which appear clearly through this maze of regulations, viz.: that no sugar is permitted to be sold in Russia that does not pay an excise tax of R. 1.75 per pood, and that sugar exported pays no tax at all. . .
> When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name, it is disguised, it is a bounty upon exportation.

The *Downs* case was cited almost immediately by the Board of General Appraisers for the proposition that tax remission upon exportation constitutes the conferral of a bounty or grant under the 1897 Act. See *F. W. Myers & Co. v. United States,* 6 Treas. Dec. 260, 264–265, T.D. 24306 (1903). It was also cited for the same proposition in *Notes on Tariff Revision* (1908), a 953-page document prepared for the use of the Committee on Ways and Means, U. S. House of Representatives, under the direction of the clerk of the committee, when the Congress was considering revision of the 1897 Tariff Act. Thus, on page 834 of the notes under the heading *Countervailing duty,* the following statement, among others, appears:

> In *Downs v. United States,* 187 U.S. 496 [, 23 S.Ct. 222, 47 L.Ed. 275] (1903), *it was held that the remission of the excise tax imposed on sugar sold in Russia granted to the exporter of sugar,* which remission is awarded in the form of a certificate having a substantial market value, and the subject of purchase and sale, *is equivalent to a bounty,* and such sugar when imported into the United States is subject to an additional duty equal to the amount of such bounty. [Emphasis added.]

The preface to these notes contains a statement that "That part of the work relating to the interpretation of the law by the courts and by the Board of General Appraisers has been prepared by Thomas J. Doherty, esq., assistant counsel, United States Treasury Department . . .."

Section 5 of the 1897 Act was reenacted essentially unchanged as section 6 of the 1909 Tariff Act. The words "province or other political subdivision of government" were added, by the 1909 Act, thus broadening the scope of the statute. Hence, reenactment by Congress of the same language in the aftermath of the *Downs* decision and on the representation made to Congress by so eminent an authority on judicial construction as the assistant counsel of the Treasury Department, represents a classical example of congressional ratification of the judicial construction put upon this statutory language. Indeed, this court said as much in *American Express Company v. United States,* 67 Cust.Ct. 141, 150–151, C.D. 4266 (1971), affirmed without reaching this issue, 60 CCPA 86, C.A.D. 1087 (1973), a case involving the construction of section 1303 [prior to amendment by the Trade Act of 1974] as applied to the practice of the Italian Government in its remission of certain internal taxes upon the exportation of transmission tower units to the United States. And inasmuch as this language has been a part of every United States countervailing duty statute dating from 1897, the argument advanced by the Treasury Department that the teachings in *Downs* as to the countervailability of tax remission is *dicta,* is without support.

In this connection, the court notes that defendant advances the argument that Congress did not intend that the scope of section 5 of the 1897 Act should be any different than the predecessor statute was under the 1894 Act when nonexcessive tax remission was expressly excluded from the countervailing duty measure applied to bounty-fed sugar importations (paragraph 182½, Tariff Act of 1894), and that the legislative history indicative of such congressional intent "apparently had not been brought to the attention of the courts in prior cases."

[See footnote 12, defendant's brief p. 13.] In other words defendant implies that the courts in *Downs* overlooked congressional limitations on the countervailing duty statute preserved for the 1897 Act from the 1894 Act as manifest in congressional debates.

It is true that the congressional proceedings culminating in section 5 of the 1897 Act were not a part of the record before the courts in *Downs*. Where the language of a statute is clear there is no need to resort to congressional debates to ascertain the intention of Congress. There is no indication that the language in section 5 of the 1897 Act lacked clarity or that it troubled the courts in any way in that case, necessitating resort by the courts to legislative history. And as for the congressional debates of the measure to which a large portion of defendant's energies have been directed, the Supreme Court had earlier warned against misdirection caused by reliance on remarks made during congressional debates, and as such, the debates would probably not have been considered relevant by the courts in *Downs*, anyway, given the clarity of the language of section 5. In *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 318, 17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897), the Supreme Court noted:

> There is, too, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body. *United States v. Union Pacific Railroad Company*, 91 U.S. 72, 79 [23 L.Ed. 224]; *Aldridge v. Williams*, 3 How. 9, 24 [11 L.Ed. 469] Taney, Chief Justice; *Mitchell v. Great Works Milling & Manufacturing Company*, 2 Story, 648, 653; *Queen v. Hertford College*, 3 Q.B.D. 693, 707.
>
> The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by

resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed. . . .

But even if congressional debates could have been considered in *Downs,* they would not have changed the results reached by the courts in that case. Paragraph 182½ of the 1894 Act had expressly excepted nonexcessive tax remissions from the specific countervailing duty applicable to bounty-fed sugar imports while recognizing tax remission to be a form of indirect bounty.[4] And of course, the term "net bounty" as used in the congressional debates on the measure by the 54th Congress clearly referred to the excess over the actual tax remitted. But the term "net amount of . . . bounty or grant" introduced into section 5 of the 1897 Act by the 55th Congress is another matter. Even in the House version of the countervailing duty measure which was passed and sent to the Senate it is to be seen that the House moved significantly away from the strictures of the countervailing duty provision as passed by the 54th Congress, in proposing alternative measures which, if enacted into law would have given the United States the option of countervailing the full bounty or just the excess bounty above the tax remitted. The House version provided that bounty-fed sugar "shall pay, in addition to the foregoing rates, a duty *equal to such bounty, or so much thereof* as may be in excess of any tax collected by such country upon such article, or upon the beet or cane from which it was produced." (Emphasis added.) 30 Cong. Rec. 316 (1897).

On the floor of the House, Representative Adolph Meyer of Louisiana, the center of the cane sugar growing industry in this

---

4. But even this exemption was conditional, and, not allowed where the requisite certificate was not produced. See T.D. 16641 (1895).

country, after referring to testimony given in committee hearings by sugar importers at New York called attention to the full bounty provision in the House Bill H.R. 379 as follows (30 Cong.Rec. 317):

. . . We suggested, wisely, I think, that instead of one-tenth of a cent duty upon bounty sugar imported into this country, the duty ought to be equal to the bounty.

And later on in the same speech Representative Meyer opted for adoption of the full bounty alternative as follows (30 Cong.Rec. 318):

In view of this selfish and dangerous policy of Germany, it seems to me that we cannot well be too careful in our measures of prevention or too energetic in our countervailing duties. Instead of imposing upon the sugars of bounty-paying countries a tax equal to the excess of such bounty over the tax collected by the country of production upon such exported article, or upon the beet and cane from which it is produced, it would, I think, be far safer to put on and tax the full amount of the bounty that may have been given, and leave to the foreign governments the matter of adjusting their own taxation and bounties. We do not say to them, you shall or shall not impose this tax or this bounty, but we do say that when we find your export bounty or other device enables you to come here and undersell our own people, we will meet you at the shore with a countervailing duty about which there shall be no quibbling or mistake. I may add here that the less the adjustment of the proper duty is complicated by needless questions of computation the simpler will be the duties of the customs collector, and the less opportunity afforded for mistakes or misconduct.

The Senate substituted language for the House version which later became section 5 following the House accession to the Senate amendment. And after the Senate version was introduced through the Senate Finance Committee, the term "net bounty" was never used in the debates that followed in reference to the Senate proposal. On the contrary, the full amount of the German bounty (38 cents on refined sugar or 27 cents on raw sugar per hundred weight) was referred to by the senators as the "export bounty." See, e. g., 30 Cong.Rec. 2204 (remarks of Mr. Gray) (1897); 30 Cong.Rec. 2224 (remarks of Messrs. Caffery, Chandler) (1897); Cong.Rec. 2825 (remarks of Messrs. Jones, Aldrich) (1897).

Since it is clear that the Senate debates indicate an intention on the part of that body of Congress to reach the full amount of the bounty paid under the language it proposed, the term "net amount of . . . bounty . . . ." was obviously intended to apply to nothing less than the full amount of the benefit foreign exporters derived from their governments. But the Senate didn't stop here. In addition, it introduced the words "grant" and "bestow" for the first time in the countervailing duty measure. The Senate was fully aware of the new German sugar tax law which was enacted in 1896, and of its increased bounties and burdensome consumption tax which it imposed upon the consumption of sugar by the German people—a burden which drew reactions of disapproval and adverse comment by various senators who participated in the debates. The new consumption tax amounted to approximately $2.16 per pound. However, sugar exported under sugar control was expressly exempt from this tax. Consequently, one need not have been a sugar expert to appreciate that exemption from the consumption tax alone (disproportionately higher than the bounties paid) would continue to stimulate exportation of sugar surplus from Germany *even if the bounties were not paid*, and thus continue to imperil the then incipient U. S. cane sugar production, unless checked by a countervailing duty measure.

Hence, it would appear that the new sugar tax levied by Germany against its people when sugar was consumed in Germany but excused when sugar was exported from Germany became the catalyst which triggered the employment of such sweeping language in the Senate countervailing duty

proposal. And the words chosen were eminently appropriate to reach such tax abatement. As the Board of General Appraisers aptly pointed out with respect to the word "grant" in *Downs* (4 Treas.Dec. 405, T.D. 22984 (1901) at page 408) "While it involves the idea of a favor or benefit conferred by the Government, sometimes of an exclusive character, it does not necessarily embrace the act of appropriating or paying money out of the public treasury. Indeed, the word 'grant,' in its broad signification, may well include the remission of a tax already levied and assessed by the authority of Government." And again, as the Supreme Court said in *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919) at page 39, 39 S.Ct. at page 220: "If the work 'bounty' has a limited sense the word 'grant' has not. A word of broader significance than 'grant' could not have been used."

There can be no question then, but that the 55th Congress was faced with a different challenge than that which confronted the 54th Congress, and as a consequence, responded to it with equally different legislation. As stated by the former clerk of the House Committee on Ways and Means in *Notes on Tariff Revision, supra* at page 834 with respect to section 5 of the 1897 Act, "This section was a new departure in tariff legislation . . . ."

There are other contentions advanced by the Government in connection with additional legislation enacted by Congress and international commitments of the United States involving policy decisions which do not supersede the acts of Congress. The court finds that the matters dealt with in these contentions do not temper the mandatory character of the countervailing duty statute in issue or illuminate the congressional intent underlying its enactment.

With respect to the Government's contention concerning the United States' commitment under Article VI(4) of Part II of the GATT,[5] it must be pointed out here that this contention has previously been considered and rejected by the courts. In *American Express Company v. United States, supra* at page 152, this court said with respect to this argument:

. . . GATT is a trade agreement, which if in conflict with a law of Congress [19 U.S.C.A. § 1303], must yield to the latter.

And our appeals court went even further in that case in regard to this argument when it said [60 CCPA at page 97, footnote 14]:

That holding finds support not only in the reasoning of the Customs Court that a law of Congress prevails over a trade agreement but also in the fact that the United States undertook Part II of the GATT, which includes Article VI(4), "* * * to the fullest extent not inconsistent with existing legislation." *Protocol of Provisional Application of the GATT*, 61 Stat. A2051 (1947).

Thus, it becomes readily apparent that although our countervailing duty statute [section 1303] speaks in more general terms of *bounties* and *grants* whereas the countervailing duty provision contained in Article VI(4) of Part II of the GATT refers specifically to exemption from or refund of taxes, the GATT's inconsistency "with existing legislation," has been determined by the construction put upon the statutory terms "bounty" and "grant" by the Supreme Court of the United States in *Downs v. United States, supra*, in holding that tax abatement or remission comes within the meaning of those terms.

The court does find it somewhat incongruous for defendant, while insisting that Congress did not intend that tax remission be countervailed under section 5 of the 1897 Act and that the Supreme Court did not so construe that statute in *Downs*, to assert in its brief (p. 15): "Of course, when the taxes are not directly related to the imported product . . . their remission consti-

---

**5.** This provision expressly prohibits contracting parties from levying countervailing duties against each other's products to offset export bounties aiding their exportation where the bounties are in the form of tax remissions or tax exemptions; and the Government maintains that such contractual obligation is binding on the United States.

tutes the bestowal of a bounty or grant upon the exportation of the product."

The defendant represents that it has had a long-standing administrative interpretation of the countervailing duty statute which permits it to determine when in its judgment a bounty or grant is excessive and thus should be countervailed. This administrative interpretation is in conflict with the decisions of the Supreme Court of the United States construing the countervailing statute, and must yield.

The Secretary of the Treasury, in administering the countervailing duty statute, must discharge his responsibility in accord with the congressional intent in that statute as interpreted by the Supreme Court of the United States.

The language of section 1303 is abundantly clear, having been construed by the courts in decisions which in turn have been approved by Congress. Generally, the scope of the statute has been held by the courts to be extremely broad; specifically, the statute has been held to embrace remissions of indirect taxes on exportation.

It is a familiar rule that long-established administrative practice is determinative only when the meaning of the statute is doubtful. *Pittsburgh Plate Class Co. v. United States*, 2 Ct.Cust. Appls. 389, T.D. 32162. . . . Therefore, an administrative practice in plain violation of the terms of the statute cannot be urged as determining the construction that should be given to it. [*United States v. Jules Raunheim (Inc.) et al.*, 17 CCPA 425, 431 (1930).]

See also: *Federal Radio Commission v. Nelson Bros. Co.*, 289 U.S. 266, 278, 289 U.S. 266, 77 L.Ed. 1166 (1933); *Federal Power Commission v. Pacific Power & Light Co. et al.*, 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180 (1939); *Federal Communications Commission v. Pottsville Broadcasting Co.*, 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

Admittedly a decision adverse to either party will have certain affects upon domestic industry and labor. It has been ruled that this court does not have equity jurisdiction, and it would be inappropriate for the court to go beyond the statute governing the issue before it and attempt to balance the equities between industry and labor. Also, if this court were empowered to wade into the uncertain waters of foreign policy it might yield to the tempting protestations of defense counsel and assume the risk of making a determination in this area, but this is an area reserved to the executive and legislative branches of the Government.

The Japanese commodity tax involves the remission of an indirect tax and, as such, is countervailable under section 1303.

Judgment will be entered in accordance with this opinion.

NEWMAN, Judge, concurring:

While I join in the opinion of Judge Richardson, which concludes that the remission of the commodity tax on the exportation of the subject Japanese consumer electronic products[1] constitutes the bestowal of a bounty or grant under our countervailing duty law, I add this concurring opinion to that of Judge Boe to elaborate on my views concerning the pivotal issues raised in the briefs of the parties.

We are confronted with an issue of grave import affecting a broad spectrum of this nation's international trade, as well as a substantial segment of the domestic industry in the United States. According to former Assistant Secretary of the Treasury David R. Macdonald, the remission of indirect (viz., consumption) taxes "is a universal practice, and one in which this Country engages, also!"[2] Moreover, Japan is one

---

1. These products include: television receivers, radio receivers, radio-phonograph combinations, radio-television-phonograph combinations, radio-tape recorder combinations, record players and phonographs complete with ampli-

fiers and speakers, tape recorders, tape players, and color television picture tubes.

2. Press briefing on October 20, 1975 by David R. Macdonald, former Assistant Secretary, Enforcement Operations and Tariff Affairs, on rejections of petitions in steel countervailing duty

of the most important trade partners of the United States, and indeed is our second largest market for exports. Hence, it is needless to say that the United States has a vital and continuing interest in a harmonious trade relationship with Japan and its exporting community.

The United States has had a general countervailing duty statute since the Tariff Act of 1897,[3] and importers have always been accorded the right to a judicial review of countervailing duty assessments by the Treasury Department. However, it was not until the amendment of section 516 of the Tariff Act of 1930 by sections 321(f)(1) and 331(b) of the Trade Act of 1974, Public Law 93–618 (1975), that American producers could obtain judicial review of a *negative* countervailing duty determination by the Secretary of the Treasury.[4] This civil action is the first presented for decision under the court's expanded jurisdiction under section 516, as amended. In overriding the Secretary's negative determination, and directing the imposition of countervailing duties on the subject Japanese exports, this court is not oblivious to the possible ramifications concerning this country's trade relations with Japan.[5] However, the proper exercise of our judicial function requires that we interpret and apply the law unrestrained by extra-legal considerations more appropriately addressed to legislative policy. Predicated upon the broad, explicit, and mandatory terms of section 303, as amended, the clear intent of Congress and the unequivocal judicial construction of the statute by the Supreme Court, I agree with the conclusion that the commodity tax exemption or rebate on exportation of the involved electronic products from Japan constitutes the payment or bestowal of a bounty or grant subject to countervailing duties.

## LEGISLATIVE HISTORY

Defendant heavily relies upon the legislative history of the countervailing duty provisions in the Tariff Acts of 1890, 1894 and 1897, contending such history demonstrates that nonexcessive tax remissions (i. e., refunds or rebates not exceeding the taxes paid by the producer to the foreign government) were not within the contemplation of Congress, and thus are excluded from the statute.

In the 1890 and 1894 provisions cited by defendant,[6] countervailing duties were ap-

cases; transcript of proceedings, page 9, annexed to plaintiff's reply brief as an exhibit.

3.  Predecessor countervailing duty provisions in the Tariff Acts of 1890 and 1894 were limited in their application to certain sugar imports.

4.  See *United States v. Hammond Lead Products, Inc.,* C.A.D. 1017, 440 F.2d 1024, 58 CCPA 129 (1971), *cert. denied* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971), reversing a decision of the Customs Court, First Division, *Hammond Lead Products, Inc. v. United States,* 63 Cust.Ct. 316, C.D. 3915, 306 F.Supp. 460 (1969). The appellate court's decision in *Hammond Lead* was nullified by Congress in the 1974 Trade Act amendment to section 516, Tariff Act of 1930. The report of the Ways and Means Committee explains the purpose of the amendment (H.R.Rep. No. 93–571, 93d Cong., 1st Sess. 76 (1973)):

Section 331(b) of the bill would amend subsections (a), (b), and (c) of section 516 of the Tariff Act of 1930, as amended (19 U.S.C. 1516), to provide for judicial review of negative countervailing duty determinations by the Secretary of the Treasury. The amendment is necessitated by a 1971 decision of the Court of Customs and Patent Appeals (*United States v. Hammond Lead Products, Inc.,* C.A.D. 1017, 440 F.2d 1024, 58 CCPA 129), which held that judicial review of negative countervailing duty determinations was not available to domestic producers. Your committee is concerned that this decision might adversely affect the ability of American producers to obtain meaningful relief under the countervailing duty law, and believes that the amendment is also warranted, equitably, because American producers have a right to judicial review in the customs courts of other customs determinations involving duty assessments, and importers are entitled to judicial review of the actual assessment of countervailing duties.

5.  In this connection see: Butler, *Countervailing Duties and Export Subsidization: A Re-emerging Issue in International Trade,* 9 Va.J. of Int'l L. 82, 147–148 (1969).

6.  Schedule E (sugar schedule), paragraph 237, Tariff Act of 1890, 26 Stat. 567, 584; schedule E (sugar schedule), paragraph 182½, Tariff Act of 1894, 28 Stat. 509, 521.

plicable only to importations of certain sugar. The 1894 statute contained a proviso which relieved an importer of the countervailing duty if he produced a certificate from the government of the country of exportation to the effect that no indirect bounty was received upon the sugar "in excess of the tax collected upon the beet or cane from which it was produced", and that no direct bounty had been or was to be paid.

Unlike the countervailing duty provisions in the Tariff Acts of 1890 and 1894 (which were applicable only to sugar), section 5 of the Tariff Act of 1897[7] generalized the countervailing duty concept, and made additional duties applicable to all dutiable importations. Further, there was no exception made in the 1897 statute for nonexcessive tax remissions similar to the proviso included in the 1894 sugar schedule provision. This 1897 generalized countervailing duty law was carried over (with certain amendments not pertinent here) into the subsequent Tariff Acts of 1909, 1913, 1922 and 1930.[8]

Predicated upon congressional debates and various fragments of legislative history, defendant strenuously argues that the 1897 countervailing duty provision, although couched in general terms, was principally intended to compensate for the export bounty system employed by Germany in connection with sugar exports; that Congress was aware that the German government did not collect an internal consumption tax on exported sugar, but nevertheless was concerned only with countervailing the so-called "net bounties" paid to German exporters of sugar, viz., bounties paid in excess of the amount which the exporter was required to pay the German government; that the proviso portion of the 1894 countervailing duty statute shows that the 1897 law was designed only to compensate

for the German system of providing for a net bounty; and that the 1897 generalized countervailing duty statute was not intended to change this net bounty concept or to impose a countervailing duty due to the failure of Germany to collect an internal consumption tax on exported sugar.

In short, defendant's position is that the legislative history of the 1894 and 1897 countervailing duty provisions shows that an excessive tax remission directly related to the exported product was the type of indirect bounty or grant which was of principal concern to Congress; and that in utilizing the term "net amount" in section 5 of the 1897 Act, Congress intended thereby to express and incorporate the excessive refund concept of the proviso contained in paragraph 182½ of the 1894 statute.

I see nothing in the legislative history relied upon by defendant which is persuasive that by using the term "net amount" in the generalized 1897 countervailing duty provision Congress intended to continue the exception in the proviso of the 1894 law for nonexcessive tax remissions. While the legislative history cited by defendant indicates that sugar bounties paid by Germany were of major concern to Congress when the bill which became the Tariff Act of 1897 was debated, Congress nevertheless generalized the countervailing duty provision so that it was no longer specifically addressed to importations of sugar (or any other product) nor specifically addressed to indirect bounties in the form of excessive tax remissions. Looking at the new broad and inclusive language of the 1897 statute as a whole, Congress encompassed therein *all* dutiable products,[9] and *any* bounty or grant, direct or indirect, however the same be paid or bestowed, with duties to be assessed *"in all such cases"*. Accordingly, I am *not* persuaded that by merely inserting the term "net amount" in

---

7. 30 Stat. 151, 205.

8. Section 6, Tariff Act of 1909, 36 Stat. 11, 85; paragraph E, Tariff Act of 1913, 38 Stat. 114, 193; section 303, Tariff Act of 1922, 42 Stat. 858, 935; section 303, Tariff Act of 1930, 46 Stat. 590, 687.

9. Section 331 of the Trade Act of 1974 made the countervailing duty law applicable, under certain circumstances, to duty-free imports for the first time in the law's history.

the 1897 statute Congress intended to resurrect the proviso in the 1894 sugar schedule provision or to exclude indirect bounties in the form of a tax exemption or "nonexcessive" rebate.

## JUDICIAL CONSTRUCTION

In *United States v. Passavant,* 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644 (1898), the effect of a tax rebate on the dutiable value of certain goods exported from Germany was considered by the Supreme Court. Although countervailing duties were not involved in the case, Chief Justice Fuller's economic analysis of the German tax rebate scheme is illuminating (169 U.S. at 22–23, 18 S.Ct. at 222):

The certificate of facts states that the German duty is imposed on merchandise when "sold by the manufacturers thereof for consumption or sale in the markets of Germany;" and "is collected when the finished product goes into consumption in Germany." As the tax accrues when the manufacturer sells, his wholesale price includes it, and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets.

*Doubtless, to encourage exportation and the introduction of German goods into other markets, the German government could remit, or refund the tax, pay a bonus, or allow a drawback.*

And it is found that in respect of these goods when "purchased in bond, or consigned while in bond, for exportation to a foreign country, this duty is remitted by the German government, and is called 'bonification of tax,' as distinguished from being refunded as a rebate." The use of the word "bonification" does not change the character of this remission. *It is a special advantage extended by government in aid of manufactures and trade, having the same effect as a bonus or drawback. To use one of the definitions of drawback, it is "a device resorted to for enabling a commodity affected by taxes to be exported and sold in the foreign market on the same terms as if it had not been taxed at all."* [Emphasis added.]

*Passavant* was cited by the Supreme Court in two landmark decisions construing the scope of the 1897 general countervailing duty statute, which is the progenitor of section 303, as amended: *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903); and *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). These decisions have been discussed in the opinions of my colleagues, and it is unnecessary to further elaborate upon them here. Suffice it to state that the Supreme Court has unequivocally enunciated that the rebate or remission of a tax on exported products where such taxes have been imposed on a domestic sale in the country of exportation constitutes a bounty or grant under the countervailing duty statute.[10] Defendant, on the other hand, is unable to cite any decision which holds that a nonexcessive tax remission upon exportation is not a bounty or grant under the statute.

After the *Downs* decision, the countervailing duty provision was periodically reenacted by Congress, but was never amended to except tax remissions from its ambit. Fundamentally, such repeated reenactments without excepting tax remissions is significantly indicative of a congressional intent to approve the judicial construction of the countervailing duty statute. *United States v. D. H. Grant & Co., Inc.,* 47 CCPA 20, C.A.D. 723 (1959); *United States v. Loffredo Bros.,* 46 CCPA 63, C.A.D. 697 (1958); *United States v. Astra Trading Corp.,* 44 CCPA 8, C.A.D. 627 (1956).

10. The *Downs* and *Nicholas* decisions have been cited and followed by the Customs Court in two countervailing duty cases involving tax remission schemes: *Hammond Lead Products, Inc. v. United States, supra,* 63 Cust.Ct. 316, *rev'd on jurisdictional grounds, United States v. Hammond Lead Products, Inc., supra,* 58 CCPA 129, *cert. denied* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971); and *American Express Company v. United States,* 67 Cust.Ct. 141, C.D. 4266 (1971), *aff'd on other grounds,* C.A.D. 1087, 472 F.2d 1050, 60 CCPA 86 (1973).

ADMINISTRATIVE PRACTICE

Citing a number of published decisions of the Secretary of the Treasury dating back to 1898 [11] and other official actions, defendant contends that "the Department of the Treasury has consistently and uniformly interpreted the countervailing duty statute from its inception as not including within the terms 'bounty or grant' a remission or refund of taxes which does not exceed the taxes actually imposed." [12] Further, defendant asserts that Congress has been well informed concerning Treasury's practice since at least 1951, and therefore "must be deemed to have approved the administrative interpretation of the countervailing duty statute".

Plaintiff does not dispute the existence of the administrative practice relied on by defendant, but urges that the administrative interpretation is entitled to no weight in view of *Downs* and *Nicholas*. Plaintiff also denies any congressional approval of the Treasury's practice.

I find defendant's reliance upon its administrative construction and the asserted congressional ratification thereof to be misplaced in the instant case for the following reasons:

**11.** T.D. 19321, 1 Synopsis of Dec. 696 (1898); T.D. 19729, 2 Synopsis of Dec. 157 (1898); T.D. 20407, 2 Synopsis of Dec. 996 (1898); T.D. 34466, 26 Treas.Dec. 825 (1914); T.D. 42895, 54 Treas.Dec. 101 (1928); T.D. 43634, 56 Treas. Dec. 342 (1929); T.D. 49355, 73 Treas.Dec. 107 (1938).

Respecting "long-established administrative practice" as it bears on the construction of tariff laws, see Judge Lane's opinion in *Commonwealth Oil Refining Company v. United States, United States v. Commonwealth Oil Refining Company*, 60 CCPA 162, C.A.D. 1105, 480 F.2d 1352 (1973).

**12.** In *Executive Branch GATT Studies*, Senate Committee on Finance, 93d Cong., 2d Sess. (1974), Congress was informed (pages 11–12):

Under administrative precedents dating back to 1897, the Treasury Department has generally not construed the rebate, remission or exemption on exports of ordinary indirect taxes (consumption taxes on goods) to be a "bounty or grant" within the meaning of our countervailing duty statute (Section 303, Tariff Act of 1930; 19 U.S.C.A. 1303). These precedents have been applied as a general rule with regard to all consumption taxes on goods. The prece-

First, the Treasury's administrative practice has been, and presently is, in direct conflict with the teachings of *Downs* and *Nicholas*. Fundamentally, where decisions of the Supreme Court and an administrative practice are in conflict, it is the decisions rather than the practice which Congress must be presumed to have ratified when reenacting the statute. *Cf. Atalanta Trading Corp. v. United States,* 32 Cust.Ct. 19, C.D. 1574, *aff'd* 42 CCPA 90, C.A.D. 577 (1954); *United States v. Douglas & Berry,* 6 Ct.Cust.Appls. 100, T.D. 35342 (1915). See also: *United States v. Bassichis Co.,* 16 Ct. Cust.Appls. 410, T.D. 43133 (1928) (legislative approval of judicial interpretation and administrative practice distinguished).

Second, when Congress considered the proposed Customs Simplification Acts of 1950 (H.R. 8304, 81st Cong., 2d Sess.) and 1951 (H.R. 1535, 82d Cong., 1st Sess.),[13] the Treasury Department attempted to persuade Congress to amend the countervailing duty law to provide that the exemption or refund of taxes on goods exported to the United States would not be countervailable. The Department's proposed legislation provided as follows:

dents are based on the principle that, since exports are not consumed in the country of production, they should not be subject to consumption taxes in that country. The theory has been that the application of countervailing duties to the rebate of consumption taxes would have the effect of double taxation of the product, since the United States would not only impose its own indirect taxes, such as Federal and state excise taxes and state and local sales taxes, but would also collect, through the use of the countervailing duty, the indirect tax imposed by the exporting country on domestically consumed goods.

The Treasury Department has not applied these precedents to tax "rebates" in excess of taxes collected on the exported product. If, for example, the foreign exporter has paid $1 in excise taxes on a product he exports to the United States but receives a rebate of $1.20 on exportation, under long-established administrative precedents of the Treasury Department the imported merchandise would be subject to a countervailing duty of $0.20.

**13.** H.R. 1535 was replaced by H.R. 5505, 82d Cong., 1st Sess. (1951).

SEC. 2

\*　　\*　　\*　　\*　　\*　　\*

(c) \* \* \* The exemption of any exported article or merchandise from a duty or tax imposed on like articles or merchandise when destined for consumption in the country of origin or exportation, or the refunding of such a duty or tax, shall not be deemed to constitute a payment or bestowal of a bounty or grant within the meaning of this section.

The purpose of the proposed amendment and Treasury's rationale in seeking an amendment of the countervailing duty statute were expressed in the Department's analyses, which reported the following (*Analysis of Customs Simplification Act of 1950, 5; Analysis of the Customs Simplification Act of 1951, 5*):

> \* \* \* Subsection (c) would also add a provision that countervailing duty shall not be levied because of the ordinary remission or refund of taxes and duties allowed on exportation by most nations, including the United States. Under the existing administrative interpretation of section 303 of the Tariff Act, countervailing duty is not imposed in such situations, but some judicial comments on the statutes do not make it clear that the courts would consider such duty or tax exemptions as outside the scope of the countervailing duty provision. The proposed amendment eliminates the possibility of rulings in conflict with the administrative practice which has been followed for over 50 years.

Congress carefully considered, but rejected the Treasury's proposed amendment, despite the Department's statement that the proposed amendment would conform the countervailing duty statute to the administrative interpretation and practice.[14] It is apparent, then, that Congress could have, but declined to nullify the Supreme Court's interpretation of the countervailing duty statute insofar as tax remissions are concerned. A reasonable conclusion from the congressional rejection of the Treasury's proposed amendments in 1950 and 1951 is that Congress was satisfied with the way it had earlier written the statute, and approved of the Supreme Court's construction of the law.

Third, when Congress was considering what was to become the Trade Act of 1974, Public Law 93–618 (1975), Treasury's practice under section 303 of applying a "directly related" test to tax remissions was brought to Congress' attention. The executive branch proposed an amendment to section 203 of the Antidumping Act of 1921, 19 U.S.C. § 162 (purchase price),[15] and explained its purpose as follows (Committee on Ways and Means, U. S. House of Representatives, *Press Release and Other Material Relating to the Administration Proposal Entitled the "Trade Reform Act of 1973" Transmitted to the Congress on April 10, 1973,* 93d Cong., 1st Sess. 89–90 (1973)):

> The second amendment deals with the treatment of certain types of tax rebates in computing purchase price. The amendment would conform the standard in the Antidumping Act to the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes. With the amendment, no adjustment to the advantage of the foreign exporter would be permitted for indirect tax rebates unless the direct relationship of the tax to the product being exported, or components thereof, could be demonstrated.

> The Treasury Department considers rebates or remissions of taxes not directly

---

**14.** Treasury's proposal to amend the countervailing duty statute to require a finding of injury, so as to conform our statute with the GATT rule on countervailing duties, was similarly rejected.

**15.** "It should be kept in mind that the Countervailing Duty Law and the Antidumping Statute are opposite sides of the coin. The former deals with subsidized imports entering this country; the latter deals with imports being sold at less than fair value in this country (meaning imports that are sold here at less than they are sold for in the country of export". King, *Countervailing Duties—An Old Remedy with New Appeal,* 24 Bus.Law. 1179, 1181 (1969).

related to an exported product or its components as being bounties or grants within the meaning of the countervailing duty law. Under the Antidumping Act, Treasury is required in its calculation of purchase price to add back to the price at which merchandise is sold to the United States "the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production, or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States." The "adding back" of such taxes under the Antidumping Act would have the effect of reducing or eliminating any dumping margins that may exist. The language of the Antidumping Act "in respect to the manufacture, production or sale of the merchandise" is somewhat broader than the standard applied to tax rebates under the countervailing duty law (directly related to the exported product or its components) and could result in inconsistency of treatment of tax rebates under the two laws.

Although Congress adopted the proposed amendment to section 203 of the Antidumping Act (see section 321 of the Trade Act of 1974), significantly the House Ways and Means Committee pointed out (H.R.Rep. No. 93–571, 93d Cong., 1st Sess. 69 (1973):

* * * The amendment would conform the standard in the Antidumping Act to the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes. However, your committee, in recommending this amendment, does not express approval or disapproval of the standard employed by the Treasury Department in administering the countervailing duty law with regard to the treatment under that law of rebates or remissions of direct and indirect taxes.

The Senate Finance Committee adopted a similar stance in its report (S.Rep. No. 93–1298, 93d Cong., 2d Sess. 172 (1974), U.S. Code Cong. & Admin.News 1974, pp. 7186, 7309:

* * * The standard in the proposed amendment parallels that standard employed by the Treasury Department under the countervailing duty law in determining whether tax rebates and remissions constitute bounties or grants. However the Committee, in recommending this amendment, does not express approval or disapproval of that Treasury practice.

Consequently, the short of the matter is that Congress has not ratified the Treasury's practice under the countervailing duty law.

## INTERNATIONAL UNDERSTANDING

Pursuant to Article VI(4) of the General Agreement on Tariffs and Trade (GATT), the imposition of countervailing duties is prohibited "by reason of the exemption of such product from duties or taxes borne by the like product when destined for consumption in the country of origin or exportation, or by reason of the refund of such duties or taxes." [16] The effect of Article VI(4) of the GATT is that the rebate or remission of indirect taxes (i. e., consumption taxes) is exempted from countervailing duties, whereas the remission or rebate of direct taxes (i. e., income taxes) is subject to countervailing duties. See: Marks and Malmgren, *Negotiating Nontariff Distortions to Trade,* 7 Law & Pol. Int'l Bus. 327, 351 (1975); King, *Countervailing Duties— An Old Remedy with New Appeal,* 24 Bus. Law. 1179, 1185–86 (1969).

Defendant urges that "[a] construction of the term 'bounty or grant' so as to exclude the remission of the Japanese commodity tax is consistent with international understandings".

---

**16.** Also, Ad Article XVI of Annex I, added to the GATT in 1955, further clarifies the rule as follows: "The exemption of an exported product from duties or taxes borne by the like product when destined for domestic consumption, or the remission of such duties or taxes in amounts not in excess of those which have accrued, shall not be deemed to be a subsidy".

When the United States and other signatories acceded to GATT, they agreed to undertake Part II thereof (which includes Article VI(4)) " * * * to the fullest extent *not inconsistent with existing legislation*". (Emphasis added.) *Protocol of Provisional Application of the GATT,* 61 Stat. A2051 (1947).[17] Unlike the GATT our countervailing duty law contains no exception for exemptions from or rebates of taxes—direct or indirect. Therefore, Article VI(4) of the GATT is inconsistent with the preexisting countervailing duty law, and must yield to the statute. Moreover, GATT could not in any event modify or rescind an existing act of Congress (viz., section 303), as Congress never delegated any authority to the executive branch to amend the countervailing duty law. See *American Express Company v. United States,* 67 Cust.Ct. 141, 152, C.D. 4266 (1971), *aff'd* C.A.D. 1087, 472 F.2d 1050, 60 CCPA 86, 97 (footnote 14) (1973).

Additionally, it is noted that economists and legal commentators have increasingly challenged the economic underpinnings for the administrative adherence to the distinction between remissions of direct and indirect taxes. The administrative policy distinguishing between remissions of direct and indirect taxes is explained by defendant in its brief in opposition to plaintiff's motion (pages 41–42):

> The non-countervailing of non-excessive remissions of taxes directly related to the imported product is based on the principle that since exports are not consumed in the country of production, they should not be subject to consumption taxes in the country of production. This leaves the importing country free to impose its taxes on the imported merchandise. Otherwise, the same goods would be subject to double taxation on its consumption, first in the manufacturing country, then in the importing country. The different treatment of different types of taxes rests further on the longstanding assumption that certain so-called indirect taxes (those levied directly on the sale of products, such as excise, sales, and turnover taxes and only indirectly on income or profits) are shifted forward to the ultimate consumer, while so-called direct taxes (those levied directly on income or profit rather than on products) are absorbed by the producer, i. e., are shifted backward and do not affect the price of the product sold to the consumer. The general assumption, in international trade treatment, is that the indirect taxes (which affect the sales price) should be levied in the country of sale of the product while the direct taxes (which do not affect the sales price) should be levied in the country where the product is produced. [Footnote omitted.] By the same token, it is the almost universal assumption that the exemption of an article from a general consumption tax in the country of manufacture gives no incentive to the manufacturer to seek the foreign market as opposed to the domestic.

It is emphasized that the foregoing quotation is accepted as an explanation of Treasury's position but not as a justification.

In a paper for the Twenty-First Annual Conference of the Canadian Tax Foundation, Toronto, November 20, 1968, former Assistant Secretary of the Treasury John R. Petty stated: [18]

> Modern economic theory suggests that the distinction implicit in the GATT treatment of direct and indirect taxes is an extreme and arbitrary assumption which does not stand the test of economic reality. While economists and businessmen may disagree on the extent of the forward shifting of indirect and direct taxes, they do agree that the extreme assumptions which are necessary to make the present GATT rules trade neutral are an inadequate approximation of reality. Therefore, a border adjustment equivalent to the full internal indirect tax tends to stimulate exports and provide protection against imports. In brief, the present provisions of GATT divert trade

---

17. This provision is commonly referred to as the "grandfather clause".

18. A copy of this paper was submitted as an exhibit annexed to plaintiff's reply brief.

and thereby disadvantage countries such as the United States and Canada which rely primarily on direct taxes. [Footnotes omitted.]

Marks and Malmgren, in their article cited *supra,* commented (7 Law & Pol. Int'l Bus. at 351):

Under GATT Article VI(4), any rebates, upon exportation, of direct taxes, e. g., income and social security taxes, are impliedly countervailable, while rebates of indirect taxes are not countervailable. The Treasury, in its administrative actions, has followed the GATT rules.` The GATT distinction between rebates of direct and indirect taxes was established at a time when most economists made the working assumption that indirect taxes are fully passed on to the consumer, while direct taxes are not. Following this rationale, the GATT, with the concurrence and drafting assistance of the U.S. negotiators, provided for different treatment of rebates of direct, as contrasted with indirect, taxes.

Most economists now appear to be more cautious in accepting this working assumption. There seems little doubt that indirect taxes frequently are not passed fully through to the consumer, while direct taxes often are partially or fully passed on. The incidence of taxation often depends on whether there exists a buyers' or sellers' market, expressed by the relative elasticity of demand or supply of the product under consideration, rather than whether the tax is direct or indirect. No definitive quantitative study has been found describing the extent to which direct and indirect taxes are, or are not, passed through. [Footnotes omitted.]

See also: *The Michelin Decision: A Possible New Direction for U.S. Countervailing Duty Law,* 6 Law & Pol. Int'l Bus. 237, 246–47 (1974); Rosendahl, *Border Tax Adjustments: Problems and Proposals,* 2 Law & Pol. Int'l Bus. 85, 88–98 (1970); Feller, *Mutiny Against the Bounty: An Examination of Subsidies, Border Tax Adjustments and the Resurgence of the Countervailing Duty Law,* 1 Law & Pol. Int'l Bus. 17, 50–54 (1969); *The United States Submission on Border Tax Adjustments,* February 16, 1966, to Working Party No. 4 of the Council on Border Tax Adjustments, Organization for Economic Co-operation and Development (copy annexed to plaintiff's reply brief as an exhibit); King, *Countervailing Duties—An Old Remedy with New Appeal, supra,* at 1188–90.

Indeed, the Treasury Department itself has publicly conceded that no distinction should be made between remissions of direct and indirect taxes in enforcement of the countervailing duty law. At a press briefing in connection with the rejection of countervailing duty petitions filed by United States Steel Corporation, former Assistant Secretary of the Treasury Macdonald stated that in determining whether there is a "subsidy" on export due to the remission of the value-added tax "[t]here is a distinction, in this area, that has been adopted and maintained by the Treasury Department, and that is reflected in the GATT—in our General Agreement on Tariff and Trade—between 'direct' taxes and 'indirect' taxes". Continuing, Mr. Macdonald stated:

The Treasury Department has consistently followed this distinction and has, in the past, countervailed against the remission of *direct* taxes.

Okay. Having made that distinction, I just want to make this additional point: The fact that we have not found the remission of value-added taxes to be a bounty or grant within the meaning of our law, does not mean that the United States Government is wild about other taxes of this sort. In fact, if there was one thing that was quite persuasive in the petition filed by U.S. Steel, it was their economic argument that, *in fact, there should be no distinction between direct and indirect taxes.*

We believe that, while we are making this decision in consonance with our prior precedents—we believe that this is a subject which requires very serious negotiations because *the distinction between so-called "direct" taxes and so-called "indi-*

*rect" taxes, economically speaking, may well be chimerical.* [Emphasis added in part.]

Okay. Any questions?

\* \* \* \* \* \*

MEMBER OF THE PRESS: Is the Treasury now tinkering with changing the direct and indirect [tax distinction], and considering it as one?

SECRETARY MACDONALD: I think it is fair to say that the United States Government is in favor of changing it.[19]

In sum, I have determined that the direct-indirect tax dichotomy (and the discredited underlying tax shifting assumptions) upon which the Treasury's administration of the countervailing duty law has been premised has no economic or legal justification.

### NONEXISTENCE OF GENUINE ISSUE OF FACT CONCERNING ECONOMIC BENEFITS OF TAX REBATING TO JAPANESE EXPORTERS

Finally, defendant contends there is a genuine issue of fact precluding summary judgment concerning certain economic benefits of the tax remission to the Japanese exporters.

Zenith's complaint alleges that the tax exemption and rebate of the commodity tax confer economic benefits on the Japanese exporters of the subject electronic products. Delineating this allegation more specifically in its brief, plaintiff asserts that due to the tax exemption and rebate of the commodity tax, Japanese exporters "have been able to sell in the United States market at a price lower than that at which they can sell in Japan or at a price that would assure a greater profit than could be earned in Japan", and the exporters "have been able to direct their products to new markets".

In its answer, defendant denies that the tax exemption and rebate results in an economic benefit to the Japanese manufacturers, and in its brief argues that "to the extent plaintiff's above-noted contentions have any relevance, plaintiff has failed to produce the necessary proof, not to mention demonstrating the absence of a genuine issue of fact between the parties". Defendant's brief also states that plaintiff's contention "assumes that the taxes which are levied directly on the product are not shifted forward to the ultimate consumer, contrary to the long-standing assumptions". According to defendant, "[p]laintiff's view assumes that the producer absorbes [*sic*] some of the tax when he sells at home. When the tax is remitted, according to the plaintiff, the producer need not absorb a portion of the tax and due to this fact may reduce his price (or increase his profit) by the amount of the tax absorbed in the home market".

I have concluded that no triable issue of fact exists in this case. Plainly, when exports are relieved of a domestic consumption tax burden which would otherwise be imposed if the goods were sold in the home market, a bounty or grant, as those terms were construed in *Downs* and *Nicholas,* is bestowed on the exporter as a matter of law. Thus, in *Downs,* the Supreme Court stated (187 U.S. at 513, 23 S.Ct. at 228):

\* \* \* But, if a preference be given to merchandise exported over that sold in the home market, by the remission of an excise tax, the effect would be the same as if all such merchandise were taxed, and a drawback repaid to the manufacturer upon so much as he exported. \* \*

And, in *Nicholas,* the Court commented (249 U.S. at 37, 39 S.Ct. at 219):

Looking only at the [countervailing duty] paragraph and judging from the first impressions of its words, the problem presented would seem to be without difficulty. There is paid to an exporter of spirits from the United Kingdom the sum of three or five pence a gallon, as the case may be, and the instant conclusion is that *the sale of spirits to other countries is relieved from a burden that their sale in the United Kingdom must bear. There is a benefit, therefore, in exportation, an*

---

**19.** Transcript of press briefing, *op. cit.,* at 3–4, 7.

*inducement to seek the foreign market. And thus it would seem, if we regarded the substance of things, that the condition of the application of Paragraph E obtains.* [Emphasis added.]

Although the Supreme Court has not had occasion to construe the countervailing duty statute since *Dows* and *Nicholas,* the economic and legal rationale of those cases remain viable today. There can be no question but that the rebate or remission of a tax on products exported, where such taxes would have been imposed on a domestic sale in the country of exportation, constitutes a subsidy to the exporter, providing him "an inducement to seek the foreign market". *Nicholas, supra.* And it was precisely such a subsidy that Congress intended should be construed as a bounty or grant subject to the imposition of countervailing duties under our statute.

Further, as noted *supra,* the assumption invoked by the Treasury Department that indirect taxes are fully shifted forward to the ultimate consumer has been shown to be arbitrary and unrealistic. Hence, in *The United States Submission on Border Tax Adjustments,* February 16, 1966, to Working Party No. 4 of the Council on Border Tax Adjustments, Organization for Economic Co-operation and Development (copy annexed to plaintiff's reply brief as an exhibit), it is noted that indirect taxes do not shift fully forward into the price of products (pages 2–3):

> \* \* \* the imposition of excise taxes and sales taxes are considered to be no different from increases in other kinds of costs. The domestic price of the product is increased to some extent by the tax (although only in exceptional cases such as cigarettes does it verge on an increase equal to the full amount of the tax) and in most cases reduces the quantity of the product demanded in the domestic market. *The price net of tax therefore is lower, and a border tax adjustment involving a full refund of the tax to the exporter makes export sales relatively more profitable than before, thereby act-*

*ing as an incentive to export the taxed commodity.* [Emphasis added in part.]

## CONCLUSION

For the reasons presented herein, I am clear that as a matter of law the remission of the Japanese commodity tax on the subject electronic products constitutes a bounty or grant under section 303, as amended. Accordingly, I join my distinguished colleagues in granting plaintiff's motion for summary judgment.

BOE, Judge, concurring:

I concur in the well-reasoned opinion of Judge Scovel Richardson. In so doing, however, I feel constrained to comment with further particularity on certain contentions of the defendant in support of the negative determination of the Secretary of the Treasury involved in the instant cause of action.

The defendant warns that a determination by this court that the remission of the Japanese commodity tax on the exports in question constitutes a bounty or grant would have a disastrous effect upon the political and economic policies and relationships of this country. In this connection I cannot refrain from observing that the courts are urged with increased frequency to resolve their determinations in the light of prophesied economic or political crises, notwithstanding judicial rationale or statutory construction to the contrary. Indeed, the resolution of any cause of action by a court must necessarily include a consideration of all facts and information which may have an appropriate and relevant bearing on the ultimate determination. However, if a decision of a court shall be predicated on the basis of political and economic expedience and, in so doing, shall ignore judicial precepts and the statutory mandates of the Congress, then assuredly, an erosion of the basic constitutional doctrine of the separation of powers results. The judiciary should not nor cannot serve as the *alter ego* of the Executive or the Congress.

In seeking affirmation by this court of the administrative determination by the

Secretary of the Treasury finding that the remission of the Japanese commodity tax on the merchandise in question destined for exportation to the United States does not constitute a bounty or grant, the defendant appears to rest its argument on two principal contentions:

(1) The legislative history relating to the adoption of the Tariff Acts of 1890, 1894 and 1897 evidences an intent on the part of Congress to exclude the remission of an indirect excise tax by a foreign nation upon exports from the provisions of our countervailing duty statute, and

(2) The omission on the part of Congress to enact legislation altering or repudiating the administrative interpretation of our countervailing duty statute constitutes a legislative approval and sanction of the Treasury Department interpretation.

I

I am unable to concur in the contention of the defendant that the legislative history of the congressional action relating to the Tariff Acts of 1890, 1894 and 1897 serves to reflect the intent of Congress to exclude the remission of an indirect excise tax from the classification of a bounty or grant under our present countervailing duty statute. The remarks by members of Congress while in floor debate, referred to in defendant's briefs, give scant legal justification to the administrative interpretation adopted and presently urged by the Treasury Department. The colloquy engaged in by the members of Congress rather would appear to emphasize the dubious familiarity and understanding on their part with respect not only to the provisions of the German Sugar Act in question, but the specific legislation under their immediate consideration. To adopt an interpretation of our countervailing duty statute upon a presumed legislative intent predicated upon the apparent limited and conflicting understanding evidenced by statements then made by some of the members of Congress, indeed, would do violence to the rules of statutory construction.

No more clear, concise or unambiguous definition of the terms "bounty" or "grant," first included in the countervailing duty provisions of the Tariff Act of 1897 and in all subsequent countervailing duty statutes enacted thereafter, can be given than the meaning expressed by the Court in *Downs v. United States,* 187 U.S. 496 (1903) at 515, 23 S.Ct. at 228:

When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name it is disguised, it is a bounty upon exportation.

In like manner, the Court therein has clearly indicated that in construing what may constitute a "bounty" or "grant," no distinction lies between a direct and an indirect tax, nor that a distinction lies between a remission of a tax and a direct payment or subsidy (at 502, 23 S.Ct. at 223):

*A bounty may be direct,* as where a certain amount is paid upon the production or exportation of particular articles, of which the act of Congress of 1890, allowing a bounty upon the production of sugar, and Rev.Stat. sections 3015–3027, allowing a drawback upon certain articles exported, are examples; *or indirect, by the remission of taxes* upon the exportation of articles which are subjected to a tax when sold or consumed in the country of their production, of which our laws, permitting distillers of spirits to export the same without payment of an internal revenue tax or other burden, is an example. *United States v. Passavant,* 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 74. [Emphasis supplied.]

The import of the foregoing quotations cannot be disclaimed by terming the same to be dicta.

The defendant, however, further urges that the term "net amount" of a bounty, as first used in the Tariff Act of 1897 and thereafter in all subsequent countervailing duty statutes, must be construed conceptually and in point of time with the provisions of the prior Tariff Acts of 1890 and 1894.

This contention likewise is based principally upon the exchange between the members of the Congress in floor debates and discussions with respect to the prior Tariff Acts of 1890 and 1894 as well as the Tariff Act of 1897 then under consideration, and the respective relationship of these acts to sugar acts of foreign nations, principally Germany. From this premise the government contends that the term "net amount," *per se,* excludes the remission of a nonexcessive excise tax from the purview of our countervailing duty statute. No explanation or legislative intent other than the hypothesis of the defendant appears to have been offered with respect to the term "net amount," first incorporated as a part of the countervailing duty provision of the Tariff Act of 1897 and included all countervailing duty statutes enacted subsequent thereto.

The intent of the Congress in the use of the term "net amount" may be understood more readily when viewed in the light of the economic and legislative history relating to the German sugar industry during the last decade of the nineteenth century. Throughout this period sugar exports increased greatly, occasioned in large measure by the payment of government bounties. Accordingly, complicated mechanisms to control the bounties paid to sugar exporters on the one hand and to alleviate the resulting economic burden thrust upon the domestic consumer were initiated, modified and amended by successive German tax laws.[1]

A reoccurring burden necessarily fell upon the Congress to enact legislation providing for countervailing duties at specific rates to "keep pace" with the rapidly changing German tax laws and procedures and the fluctuating bounties occasioned thereby. The need for a countervailing duty statute unrestricted by a specific percentage amount and sufficiently elastic in determination to effect the regulation of any exports from any foreign country was clearly evident.

The Tariff Act of 1897 provided the first countervailing duty provisions of general application. This statute is characterized by a language far more broad and inclusive than the language contained in the Tariff Act of 1890 and 1894 in which the countervailing duty provisions were directed solely to sugar exported from countries which continued, in turn, to enact involved and intricate tax mechanisms in connection with their domestic production and consumption of this commodity as contrasted with the exportation thereof. The Act expanded the scope of the Tariff Act of 1894 by specifically deleting the provision of that Act which limited the application of the statute to excessive tax remissions only. As Judge Richardson appropriately noted in *American Express Company v. United States,* 67 Cust.Ct. 141, 150–151, C.D. 4266, *aff'd on other grounds,* C.A.D. 1087, 472 F.2d 1050, 60 CCPA 86 (1973):

[W]ith the advent of the decision of the Supreme Court in *Downs,* it is clear that if Congress had wanted to nullify the effect of the decision in that case it could easily have done so through reenactment of a successor provision to section 5 of the 1897 Tariff Act (or amended the statute) that expressly excluded tax remissions from its ambit, akin to its treatment of that subject in paragraph 182½ of the 1894 Tariff Act. The fact that Congress has never done so is, in our opinion, indicative that it approves of the holding in *Downs,* by reason of which, that case represents the law on the subject of tax remissions to date insofar as the question of "bounties" is concerned.

The Congress also chose to include such meaningful terms and phrases in the Tariff Act of 1897 as:

"pay or bestow," "directly or indirectly," "any bounty or grant," "net amount of

---

1. In 1894 and 1895, sugar exports were reported to have constituted 72% of the total German production. In a single year more than $30,-000,000 was paid as bounties to sugar exporters from German internal sugar tax revenues totaling more than $40,000,000. German internal revenue taxes were amended or new taxes enacted in 1887, 1892, 1893 and 1896. *Reciprocity,* J. Laurence Laughlin, Ph.D. and H. Parker Willis, Ph.D. (New York: The Baker & Taylor Co., 1903).

such bounty or grant," "however the same be paid or bestowed" and "[t]he net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury  *  *  *."

The inclusion of these terms as well as the significance of their inclusion has been noted by the Supreme Court. In its consideration of the aforequoted language and in answer to the argument of petitioner's counsel therein, which closely parallels the contentions now urged by the defendant in this proceeding, the Court in the case of *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), at 38–39, 39 S.Ct. at 220 stated:

In further support of their distinctions *counsel cite the executive practice of this country, and adduce the decisions of this and other courts to show that such practice is a useful resolvent of the meaning of words and of legislative intention.*

We appreciate the strength of the argument, but the circumstances are but aids to persuasion; they do not compel it. Every new statute is individual and presents its own problem. *That before us does, and, as we have said, looking at its words alone, has no uncertainty of purpose.* Whenever any country "shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise," there shall be levied and paid upon it, upon importation, in addition to the regular duty, an additional one "equal to the net amount of such bounty or grant, however the same be paid or bestowed." The statute was addressed to a condition, and its words must be considered as intending to define it, and all of them—"grant" as well as "bounty"—must be given effect. If the word "bounty" has a limited sense, the word "grant" has not. A word of broader significance than "grant" could not have been used. Like its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another. And if the "something" be conferred by a country "upon the exportation of any article or merchandise," a countervailing duty is required by Paragraph E. [Emphasis supplied.]

The absence of a specific reference to the words "net amount" in prior decisions does not justify the application of an esoteric meaning to the term. The word "net" as used therein should be given no other connotation than its ordinary meaning. *American Customs Brokg. Co., Inc., a/c Hamakua Mill Co. v. United States,* 433 F.2d 1340, 58 CCPA 45 (1970). The use of the word "net" permits the application of the statute with equal facility in the determination of the amount of a bounty paid under differing laws of any foreign nation. Thus, in ascertaining the "net amount" of a bounty or grant, the opportunity exists to consider whether a bounty may have been paid either in full or in part or whether the bounty in question may have been offset in full or in part by other charges consistent with the law of the foreign nation from which the exports have been received. In short, the term "net" has been used to afford the Secretary of the Treasury a criterion to determine the appropriate amount of a countervailing duty which may be applied to the respective exports which have been the beneficiary of differing bounties of any foreign nation. Clearly, however, the criterion used to determine the proper amount of a countervailing duty includes both nonexcessive and excessive tax remissions. Accordingly, when it has been determined that a bounty or grant has been paid by a foreign nation upon its exports, the duty and responsibility of the Secretary of the Treasury lies only and solely in the power delegated to him by the Congress to determine the "net amount" thereof.

In light of the foregoing, the construction and interpretation urged by the defendant cannot be accepted by this court.

## II

If, as the defendant contends, a long-standing administrative interpretation of the countervailing duty statute should alone dictate the presently accepted legal con-

struction thereof, then, indeed, judicial review becomes a mockery. It is acknowledged that, "[t]he interpretation of a statute by an agency charged with its enforcement is a substantial factor to be considered in construing the statute, *New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 421, 93 S.Ct. 2507, 2516–17, 37 L.Ed.2d 688, 699 (1973); *Columbia Broadcasting System, Inc. v. Democratic Comm.,* 412 U.S. 94, 121, 93 S.Ct. 2080, 2095–96, 36 L.Ed.2d 772, 794 (1973) \* \* \*." *Youakim et al. v. Miller,* 425 U.S. 231, 235–236, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976). However, it must also be acknowledged that in the construction of a statute an "expressly articulated position" should be adopted at the administrative level. *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Where it appears that the statutory interpretation by a department or agency is in error, judicial approbation should not be given. In the recent case of *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973), the United States Supreme Court clearly recognized this limitation upon the independent exercise of administrative statutory construction:

> The Commission's more recent interpretation of the statute in the guideline relied on by the District Court is no doubt entitled to great deference, *Griggs v. Duke Power Co., supra,* 401 U.S. 424 at 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158; *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 545, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971) (Marshall, J., concurring), but that deference must have limits where, as here, application of the guideline would be in-

consistent with an obvious congressional intent not to reach the employment practice in question. Courts need not defer to an administrative construction of a statute where there are "compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); see also *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969); *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

The defendant has urged that ambiguity in the countervailing duty statute justifies the acceptance of the long-standing interpretation applied by the Secretary of the Treasury.[2] A careful examination of the countervailing duty provisions contained in the original Act of 1897 and reenacted in all subsequent countervailing duty statutes neither reflects the ambiguity alleged by the defendant, nor sustains the "reasonability" of the interpretation adhered to by the Secretary of the Treasury. Particularly, is this true in light of the clear construction of the statute and the specific terms "bounty" and "grant" contained therein by the Supreme Court in the cases of *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903) and *Nicholas & Co. v. United States, supra.*

What then is the real question before us in this proceeding? To no extent can it be said that the issue is limited to a question involving a recognized right of a governmental department to interpret a statute, the provisions of which it is charged to enforce. Rather, the basic question before

---

**2.** The present interpretation urged by the defendant is contrary to the interpretation offered by the defendant in its briefs to the Supreme Court in the *Downs* and *Nicholas* cases. The position of the government therein is reflected by the following statement:

> Furthermore, if a foreign government should object to our drawbacks or remission of internal taxes as unduly encouraging our export trade to that government's detriment, in its own markets, and as amounting in practical effect to an indirect bounty, we might successfully urge our diplomatic resistance to that view, but I can not see that we should

have conclusive legal ground for resisting simply because it was an ordinary tax remission or drawback in our municipal system. \* \* \*

> \* \* \* For it seems that any special favor, benefit, advantage, or inducement conferred by the Government, even if it is given as a release from burden and is not a direct charge upon the Treasury, is fairly included in the idea and meaning of an indirect bounty. [Brief for The United States, in The Supreme Court of the United States, October Term 1902, on Writ of Certiorari, *Downs v. United States,* No. 318 at 23–24, 25.]

us is whether the Secretary of the Treasury shall have the right and be permitted to continue to interpret the provisions of our countervailing duty statute contrary to its explicit and unambiguous language and contrary to the interpretation and construction previously placed thereon by the highest Court of our land. The answer can only be, no.

In the Trade Act of 1974 (19 U.S.C., sec. 2101), under which statute we are guided in this action, Congress has laid to rest with finality any question as to its intent with respect to the construction of the countervailing duty statute. In section 331 thereof, amending sections 303 and 516 of the Tariff Act of 1930 (19 U.S.C., secs. 1303, 1516), substantially the same language contained in prior countervailing duty statutes has again been incorporated. However, it will be noted that in section 303(d), the Congress affirmatively has recognized the very international economic and political problems, which the defendant in this action has directed to the attention of this court. To these problems the Congress has responded. In so doing, the Congress:

1. Underscores its desire and objective that the President " * * * seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties." (19 U.S.C., sec. 1303(d)(1).)

2. In keeping with this objective, the Congress does not require the imposition of the countervailing duty provisions for a period of four (4) years from the date of the enactment of the Trade Act if:

a. The Secretary of the Treasury determines adequate steps have been taken to reduce substantially or eliminate the adverse effect of a bounty or grant, and that

b. a reasonable prospect exists that successful trade agreements will be entered into reducing or eliminating the trade barriers in question, and

c. imposition of the additional countervailing duty would be likely to seriously jeopardize the completion of such negotiations.[3]

Any decision not to impose the appropriate countervailing duty of the Secretary of the Treasury pursuant to the foregoing delegated authority is required to be reported to the Congress, either body of which may disapprove the decision of the Secretary, thereby restoring the immediate and full application of the countervailing duty provisions.[4]

From the foregoing, it is clear that the Congress has reaffirmed not only to the executive branch of this government, but to all nations, its approval of the judicial construction placed upon the countervailing duty statutes of the United States. At the same time, however, a procedure is provided to assist in the resolution of international problems relating to bounties, grants and subsidies through negotiation and the establishment of internationally agreed rules.[5]

---

**3.** 19 U.S.C., sec. 1303(d)(2)(a)(b)(c).

**4.** 19 U.S.C., sec. 1303(e)(1)(2).

**5.** The report of the Committee on Ways and Means, House of Representatives, in the consideration of this legislation is illustrative of the realization by the Congress of the need to provide discretionary authority on the part of the Secretary of the Treasury to withhold the application of the countervailing duty provisions if the same may prove counterproductive during the course of negotiations.

The 4-year temporary discretionary authority was accorded because of the very real danger that the mandatory provisions of section 303, combined with the committee's amendment providing for a 12-month time limit for action under this section, could compel the Secretary to take actions which might well frustrate the successful outcome of the forthcoming negotiations. The committee is aware that there are differences of opinion internationally as to what constitute permissible and nonpermissible export assists under international law and practice, and that the negotiation of an agreement on this issue may prove difficult. *The committee has no desire to sanction certain existing export-assist practices conducted by various foreign governments.* It also recognizes that the United States itself may well be conducting programs of export-assists which foreign

Many of the issues and the facts relating thereto which have been presented to this court were likewise presented to the Congress at the time of its consideration of the Trade Act of 1974. Had the Congress intended to exclude the remission and/or exemption of a nonexcessive excise tax from the classification of a bounty or grant, it could and would have done so. It has chosen not to so do, but rather to open the door to discussion and negotiation among the nations. To construe our recently enacted countervailing duty statute in conformity with the interpretation urged by the defendant not only would disregard the statutory intent of the Congress, but would thwart the very objective it seeks to attain through negotiation and agreement.

It having been determined in the proceeding that the remission of the Japanese commodity tax upon the electronic products which are the subject of this action constitutes a bounty or grant under our present countervailing duty statute (19 U.S.C., sec. 1303), the instant action, accordingly, should be remanded to the Secretary of the Treasury to determine and assess an additional duty equal to the net amount of the bounty or grant bestowed upon such products exported from Japan and entered into the United States from and after the entry of judgment herein.

### ORDER

Upon reading and filing plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment, and upon all other papers and proceedings had herein, it is hereby

ORDERED that plaintiff's motion for summary judgment be, and the same is granted, and it is further

ORDERED that defendant's cross-motion for summary judgment be, and the same is, denied.

ADJUDGED AND DECREED that the exemption, under the Commodity Tax Law of Japan, of television receivers, radio receivers, radio-phonograph combinations, radio-television-phonograph combinations, radio-tape recorder combinations, record players and phonographs complete with amplifiers and speakers, tape recorders, tape players, and color television picture tubes (hereinafter "subject electronic products") from a commodity tax, when exported from Japan, or the refund of such tax on the exportation from Japan of the subject electronic products, constitutes the payment or bestowal of a net bounty or grant within the embrace of section 303 of the Tariff Act of 1930, as amended (19 U.S.C, § 1303); and

The Secretary of the Treasury is hereby directed to ascertain and determine or estimate the net amounts of the bounty or grant paid or bestowed on the exportation of the subject electronic products from Japan and to order the appropriate customs officers throughout the United States to assess countervailing duties, in said net amounts equal to the said bounty or grant, on the subject electronic products exported from Japan, entered or withdrawn from warehouse for consumption on or after the day following the date of entry of this Order.

governments may find inconsistent with international law and policy.

With this background, the Secretary of the Treasury must be temporarily accorded some degree of latitude in administering section 303 until an international agreement is reached regarding the international practices which would be considered permissible and nonpermissible. Otherwise the Secretary of the Treasury may conceivably be constrained to take countervailing action under section 303 against a practice which ultimately may be internationally agreed to be a permissible international export assist. The discretionary authority accorded herein has been re-

stricted to 4 years to facilitate the international negotiations. It has been accorded on the understanding that the U.S. negotiators will report regularly to the Congress on the progress and ultimately on the outcome of the negotiations with respect to international export assists. *The committee assumes that it may be necessary to further amend section 303 depending upon the outcome of these negotiations, assuming that they terminate in an agreement acceptable to the United States.* [Emphasis supplied.] [H.R. 10710, House Committee on Ways and Means, House Report No. 93-571, 93d Cong., 1st Sess., October 10, 1973, at 75-76.]